640 So.2d 1305 (1994)
Larry and Laura THERIOT, et al.
v.
Dean LASSEIGNE, et al.
No. 93-C-2661.
Supreme Court of Louisiana.
July 5, 1994.
Rehearing Denied September 15, 1994.
*1307 Charles E. Soileau, Bertrand & Soileau, Rayne, for applicants.
Edmond L. Guidry, III, Guidry & Guidry, St. Martinville, Barry J. Sallinger, and Victor James Versaggi, Lafayette, for respondents.
KIMBALL, Justice.[*]
This suit arises out of a tragic traffic accident in the early morning hours of December, 1989, at the intersection of Main Street (La. Hwy. 31) and Bridge Street (La. Hwy. 96) in the Town of St. Martinville.[1] A truck driven by Dean Lasseigne struck a car containing seven passengers, driven by Travis Courville, as it attempted a left turn onto Bridge Street heading south on Main Street. The impact, which was on the passenger's side, knocked the car into a post of a building at the corner. The passenger in the right front passenger's seat, Jarrod Courville, was killed instantly and the other occupants were seriously injured.
The parents of the passengers brought actions against Travis Courville; Dean Lasseigne; State Farm Mutual Automobile Insurance Company, the insurer of both Courville and Lasseigne; The City of St. Martinville; Teche Bank & the Trust Company; and the State of Louisiana, Through the Department of Transportation and Development (DOTD). Prior to trial, settlement was reached with State Farm, The City of St. Martinville, and Teche Bank and Trust; in effect only DOTD remained as a defendant by the time of trial.
The cases were consolidated by the trial court and the issues of liability and damages were bifurcated. Plaintiffs brought actions against DOTD under theories of both negligence *1308 (La.C.C. art. 2315)[2] and strict liability (La.C.C. art. 2317).[3] Following a bench trial on the issue of liability, the trial court rendered judgment allocating sixty percent fault to Courville and forty percent to Lasseigne.
Plaintiffs appealed the judgment of the trial court, and the court of appeal reversed, finding manifest error on the part of the trial court. The court of appeal assigned thirty percent fault to Travis Courville and thirty percent fault to DOTD, and affirmed the trial court's assignment of forty percent fault to Dean Lasseigne.[4]
After a thorough review of the record, finding no manifest error, we hereby reverse the court of appeal and reinstate the trial court's judgment. An examination of the entire record supports the trial court's finding that the cause of the accident is solely attributable to the negligence of Travis Courville and Dean Lasseigne.
On December 2, 1989, Travis Courville worked the three to eleven shift. After work, he went home, showered and changed clothes, and then picked up a twelve-pack of beer on the way to meet a friend at the Bandstand, a local nightspot. Courville testified he drank five or six beers between 11:30 P.M. and 2:00 A.M. At 2:00 A.M., when the Bandstand closed, Courville and a group of friends left for a party in his car. There were seven young people in Courville's two-door Honda Prelude, four in the back seat and three in the front. The front seating area consisted of two bucket seats. Terri Lynn Boudreaux, whom Courville was seeing at the time, was seated on the console between the seats which also housed the five speed manual stick shift.
Courville testified at trial that the radio was probably on, but he could not recall whether or not he was talking to Terri or anyone else immediately preceding the accident. The route to the party took Courville south down Main Street where he planned to turn left onto Bridge Street. Courville had driven down Main Street hundreds of times and had turned left onto Bridge Street at this intersection many times.
At about the same time that Courville left the Bandstand, Dean Lasseigne left a local lounge where he was shooting pool that evening from about 8:15 P.M. until 1:50 A.M. Lasseigne testified he had consumed six to ten beers while at the lounge and had eaten nothing since lunch around noon. He admitted he had a "buzz" on and was feeling "high".[5]
The intersection of Main and Bridge streets is what is known as an "offset intersection." The centerline of Main Street north of its intersection with Bridge Street lies approximately fifteen feet west of the centerline of Main Street south of its intersection with Bridge Street. The intersection is in a commercial area and there are parking lanes on the west side of Main Street both north and south of Bridge Street. The posted speed on this stretch of Main Street is 25 M.P.H. Both streets became part of the state highway system at least fifty years ago and the configuration of the intersection has been virtually unchanged since its early use, which according to testimony at trial, was probably as a wagon path to the church on *1309 the southeast corner of the intersection or to businesses in the area. There is a traffic light at the intersection which cycles green-yellow-red.

Lasseigne was headed north on Main Street on his way home when he stopped for a red light at the intersection of Main and Port streets, one block south of Bridge Street. When the light turned green, Lasseigne accelerated to between 35 and 50 M.P.H. as he approached the intersection of Main and Bridge Streets. At the same time, the light at the intersection of Main and Bridge streets also turned green as Courville approached the intersection heading south. Two vehicles preceded Courville through the intersection and continued south on Main Street. Courville was following one car length behind a black Chevrolet Blazer which had darkened windows preventing a following driver from seeing through the vehicle and perhaps detecting lights of other vehicles through the glass.
The offset of the intersection requires drivers proceeding straight through the intersection to move to the left after crossing the intersection. This movement can create temporary blind spots for the drivers behind them and can also obscure them from sight of vehicles heading north. This obscurement is increased when large vehicles, or as in this case, vehicles with darkly tinted windows, precede a turning vehicle through the intersection.
Courville did not come to a complete stop at the intersection, but looked south down Main Street to the extent his vision would allow, which he testified was sixty to ninety feet. Seeing nothing coming, he followed the *1310 Blazer through the intersection and proceeded to execute a left turn onto Bridge Street. Lasseigne, heading north, saw Courville's car only an instant before the collision. The passenger seated on the front right, Jarrod Courville, was killed instantly and the other passengers were seriously injured.
Plaintiffs argued DOTD was at fault by failing to maintain the intersection in reasonably safe condition. Also, plaintiffs contended that the misalignment or offset nature of the intersection allowed blind spots which were unreasonably dangerous to motorists and presented expert testimony in support of their contention.
In its reasons for judgment, the trial court recognized that at this particular intersection the offset of the lanes allows blind spots caused by preceding vehicles that can obscure the approach of oncoming vehicles which are too close for a left turn to be made safely. However, the trial court noted that a left turning driver has a duty to wait the few seconds necessary to have a clear view so as to safely negotiate the turn. The trial court recognized that blind spots can occur at all intersections depending on the relative sizes and positions of the vehicles and that preceding vehicles create blind spots on virtually all highways. Additionally, the trial court concluded that it is impossible to design a highway free from all blind spots and, thus, the misalignment of the intersection did not create an unreasonable risk of harm to left turning motorists. Significantly, the trial court found the cause of the accident and of plaintiffs' damages to be the concurrent negligence of Travis Courville and Dean Lasseigne and assigned one hundred percent fault to the two drivers. We find implicit in the court's finding and assignment of fault that a breach of duty by DOTD was not a cause-in-fact of the accident.
Plaintiffs brought this suit against DOTD under theories of both negligence and strict liability. Under either theory, the duty owed is the same and a finding of cause-in-fact is essential to the assessment of liability.[6]Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La. 1/14/94), 630 So.2d 1289 (La.1994). Cause-in-fact is usually a "but for" inquiry which tests whether or not the injury would have occurred "but for" the defendant's substandard conduct. Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289 (La.1993). A finding of no cause-in-fact ends the inquiry into liability.
Cause-in-fact is a factual question to be determined by the factfinder. Cay v. DOTD, 93-0887 (La. 1/14/94), 631 So.2d 393 (La.1994). A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). In order to reverse a factfinder's determinations of fact, an appellate court must review the record in its entirety and meet the following two-part test as set out by this court in Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993):
1) An appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the factfinder is clearly wrong (manifestly erroneous).
See also Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
*1311 In reversing the trial court, the court of appeal found that "more probable than not" Courville would have seen Lasseigne's vehicle approaching in time to take evasive action if DOTD had constructed a left turn lane and re-directed "through" traffic at the intersection, as suggested by plaintiffs' expert, Dr. Dart. Alternatively, the court found that had DOTD changed the light synchronization at Port and Bridge Streets, "more probable than not" the accident would not have occurred because the speed of the Lasseigne vehicle would have been reduced and Courville's car would have cleared the intersection before Lasseigne's car reached it. However, a thorough review of the record reveals that a reasonable factual basis exists for the trial court's finding that the negligence of Courville and Lasseigne was the cause of the accident, and that the trial court was not manifestly erroneous or clearly wrong in its assignment of fault.
Both plaintiffs and defendants presented experts at trial who were well qualified in their fields. Dr. Olin Dart, who testified for plaintiffs, has a Ph.D. from Texas A & M in Civil Engineering with an emphasis in highway design and traffic engineering. Dr. Dart was qualified as an expert in traffic engineering, highway design, traffic safety, and accident reconstruction.
Dr. Walton, who has a contract with the State's department of risk litigation, testified as an expert for DOTD. Dr. Walton has a Ph.D. in Engineering with a research emphasis in the areas of roadway lighting, driver visual performance, and visibility of objects. Dr. Walton was qualified as an expert in traffic engineering, highway design engineering, human factors engineering, and accident reconstruction.
Dr. Dart prepared a number of charts projecting possible "cones of obscurement" caused by the geometrical configurations resulting from the relative positions of the vehicles as they may have moved through the intersection on the night of the accident.[7] Ironically, the trial court's judgment is supported by Dr. Dart's own testimony. Dr. Dart testified that a resulting obscurement exists for "only an instant" and that as vehicles move through the intersection, the alignment of the vehicles and the obscurement changes.[8] Furthermore, Dr. Dart did not perform a reconstruction of the accident and could not testify as to what obscurements actually existed that night or exactly how long they may have lasted.
As a solution to the obscurement problem, Dr. Dart suggested that the right lane of traffic heading in a southerly direction on Main Street could have been expanded to two lanes by utilizing the parking lane for through traffic and making the existing lane a left turn lane. He testified that had the left turn lane existed and been in use, Courville would likely have been able to see Lasseigne's truck stopped at the light in the next block and would have had more time to safely exit the intersection. Although this testimony may be valid evidence of possible improvements, the fact that these specific improvements were not made by DOTD does not lead inexorably to a finding of unreasonable dangerousness. Because the trial court found that the configuration of the intersection was not the cause of the plaintiff's injuries, we need not address hypothetical measures for its improvement.
Dr. Walton, testifying for DOTD, did not dispute the misalignment of the intersection, but attributed the accident solely to driver error based on his assessment of the total situation that night from a human-factors engineering perspective. Dr. Walton specifically noted the situation in Travis Courville's car on the night of the accident. He testified that from a human-factors engineering standpoint, a driver can only pay attention to a certain number of factors in his environment without "loadshedding" or giving less attention to any particular task.
*1312 Testimony at trial revealed that the car was overcrowded, the radio was on, one girl was seated on the console where the stick shift was and could have interfered with Courville's ability to down shift, and Courville may have been conversing with the passengers at the time he began his left turn onto Bridge Street. Dr. Walton testified that these factors could have, and likely did, interfere with Courville's ability to pay attention to what was going on around him traffic-wise.
Furthermore, Dr. Dart admitted that the accident would not have occurred had Lasseigne been driving at the speed limit of 25 M.P.H. or even exceeding it at 35 M.P.H. He also testified: "If the Lasseigne vehicle was obeying the speed limit, there would have been over two seconds of time there from the time that the vehicle had first become visible until it entered and reached the intersection, and that would probably be about enough time, almost enough time to clear the intersection."
Courville testified that when he began the turn, he could only see sixty to ninety feet down Main Street. Even at the posted speed of 25 M.P.H., he would only have had almost enough time to clear the intersection if a vehicle had been within his range of sight. The trial court clearly could have found Courville was negligent in not waiting until he could see a safe distance before beginning his left hand turn and that his negligence combined with the excessive speed of the Lasseigne vehicle were the causes-in-fact of the accident.
The testimony of Courville himself showed that he failed to exercise the care and caution expected of drivers executing a left turn. A driver making a left turn has a statutory duty, under La.R.S. 32:122 to "yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard." "A left turn is one of the most dangerous maneuvers a motorist may execute and requires the exercise of great caution." Thomas v. Petrolane Gas Service, 588 So.2d 711 (La. App.2d Cir.1991), writ denied 590 So.2d 1201 (La.1992). Harper v. State Farm, 511 So.2d 1283 (La.App.2d Cir.1987), Ebey v. Coggins, 474 So.2d 1352 (La.App.2d Cir.1985). Before attempting a left turn, a motorist should ascertain whether it can be completed safely. Thomas, 588 So.2d at 717.
At the time Courville began his turn, he knew he could only see sixty to ninety feet down Main Street, not far enough, according to the experts, to assure a safe left turn onto Bridge Street under any circumstances. Courville was intimately familiar with the intersection and was aware of the added time it might take to execute a left turn.[9] The testimony of Dr. Dart indicated, and the trial court found, that whatever visual obscurement existed which limited Courville's vision to sixty to ninety feet would have disappeared had he only waited a few seconds.
Furthermore, Lasseigne was significantly exceeding the speed limit, traveling 35-50 M.P.H. in a 25 M.P.H. zone. By his own admission, he had a "buzz" on and felt "high," having consumed six to ten beers in the hours prior to the accident. Both experts testified that had Lasseigne been obeying the speed limit the accident could not have occurred and the trial court could reasonably have concluded that "but-for" the speeding of Dean Lasseigne, the accident would not have occurred.
Given a thorough review of the record, we find that the trial court did not commit manifest error in finding the sole cause of the accident to be attributable to the negligence of Dean Lasseigne and Travis Courville and that implicitly a breach of duty by DOTD was not a cause-in-fact of the accident.
Significantly, the court of appeal discounted the testimony of DOTD's expert, Dr. Walton, finding "his ultimate assignment of fault [to driver error] did not result from any finding based on the laws of physics and mathematics," and that "[a]n expert's approach to fault finding, which is not scientifically rooted should not supplant the flexible, *1313 unbiased and reasoned analysis articulated by our courts in assessing delictual responsibility in such cases." The court of appeal, in its opinion, stated it found Dr. Dart's testimony more persuasive. However, both experts had excellent credentials and were qualified in their respective fields by the trial court.
Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler, 558 So.2d at 1111. In Stobart, we said:
However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... Nonetheless this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.'" (citations omitted).
Credibility determinations are subject to the strictest deference and the manifest error-clearly wrong standard demands great deference for the trier of fact's findings. Rosell v. Esco, 549 So.2d 840, 844-45 (La.1989). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883; Canter v. Koehring Co., 283 So.2d 716 (La.1973). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Stobart, 617 So.2d at 882.
The trial court apparently gave more weight to the testimony of Dr. Walton, who attributed the cause of the accident solely to driver error, and we cannot say the trial court was manifestly wrong in doing so. Furthermore, the court need not have chosen between the experts in forming its opinion; the facts alone provide a basis for the trial court's decision.
Having thoroughly reviewed the record, we find that the trial court did not commit manifest error in finding that the cause of the accident was solely attributable to the negligence of Travis Courville and Dean Lasseigne. We therefore reverse and reinstate the trial court's decision. Because allocation of fault is a factual determination subject to the manifest error rule, and because we find the trial court was not manifestly erroneous in its allocation, we reinstate the trial court's allocation of fault assigning forty percent fault to Dean Lasseigne and sixty percent to Travis Courville.

DECREE
For the reasons assigned above, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED AND RENDERED.
LEMMON, J. concurs and assigns reasons.
WATSON, J., dissents believing that the Court of Appeal was correct in assigning a percentage of fault to DOTD.
ORTIQUE, J., dissents and assigns reasons.
LEMMON, Justice, concurring.
Cause-in-fact is not the determinative factor in my view. Rather, the case turns on whether the Department breached its duty to maintain a safe intersection by failing to change the alignment. I conclude that the alignment was not unsafe, since a southbound driver, who was following preceding vehicles and intending to turn left, had an unobstructed view of oncoming traffic merely by not following the preceding vehicles too closely or by delaying the left turn momentarily *1314 until the view was totally unobstructed by preceding vehicles. A motorist's view of oncoming traffic can be obstructed at any intersection (or even on open highway) when he follows too closely, and accidents can occur by his entering the lane of oncoming traffic without regard to the obstruction.
There is no liability on the Department in this case because there was no breach of its duty to maintain a safe intersection.
ORTIQUE, Justice, dissenting.
The majority reverses the judgment of the court of appeal, finding that the court of appeal erred in allocating to the DOTD a proportion of the fault for the accident which is the subject of this lawsuit. I respectfully dissent.
The statute which governs actions against public entities for damages caused by the condition of things within its care and custody, La.R.S. 9:2800, is not addressed in the majority opinion. This omission is critical in that it permits the outcome reached by the majority.
La.R.S. 9:2800 provides that any action brought against a public entity for damages caused by the condition of things within its care and custody cannot be brought unless the public entity had actual or constructive prior notice of the particular vice or defect which caused the damage. By failing to include this statute in their analysis, the majority is able to overlook that portion of the record which establishes the liability of the DOTD.
In this case, the DOTD not only had notice of the unreasonably dangerous condition of the intersection, but also assessed the feasibility of correcting the condition. In a letter dated July 16, 1987, more than two years prior to the accident of December 2, 1989, former Senator, now judge, Oswald Decuir inquired as to the status of his request to investigate realigning the curve at the intersection of Main and Bridge Streets in St. Martinville. This letter was directed to Mr. Bill Fontenot, a design engineer employed by DOTD at its Lafayette district office.[1]
At trial, Judge Decuir testified that St. Martin Parish Sheriff, Charles Fuselier had requested his assistance in advising the DOTD of the misalignment of the streets and the frequency of accidents at the intersection. (R. at 1040-1043). Mr. W.C. Vincent, DOTD District Administrator responded to former Senator Decuir's letter on July 21, 1987.[2] This response states:
"This will acknowledge receipt of your letter dated July 16, 1987, referring to a conversation with our Mr. Bill Fontenot concerning the realignment of the intersection of Louisiana 31 and Louisiana 96 in St. Martinville.
On the surface, this request would appear to be a very costly one to accomplish because of the probable amount of property damage which would result to existing buildings located at this intersection. We will nevertheless review the possibility of making a realignment of this location after which time we will advise you of our recommendations concerning this request."
A copy of this letter was forwarded to Sheriff Fuselier and to Mr. Bill Fontenot with the following notation: "Mr. Fontenot: Please have survey and topography Map made at this location in order that we may determine if this is feasible."
In early 1989, St. Martinville Mayor Earl Willis, met with Mr. Eugene Waguespack, Chief of the Lafayette district office for the DOTD. During this meeting, the mayor and Mr. Waguespack discussed the need to acquire a right of way at the intersection.[3] Such a right of way would include the building at the northeast corner of the intersection.[4] Mr. Waguespack testified that the *1315 DOTD did not regard the requests for an investigation of this intersection as flaky requests. (R. at 867).
The evidence regarding communication between the DOTD and former Senator Decuir, Mayor Willis, Mr. Fontenot and Mr. Waguespack, clearly establish that notice as contemplated by La.R.S. 9:2800 was provided to the DOTD.
The majority finds that the court of appeal erred in reversing the trial court in part because they relied upon the testimony of plaintiffs' expert rather than the testimony of Dr. Ned Walton, the DOTD's expert. See majority opinion at 1311, wherein the majority declares: "[f]urthermore, Dr. Dart did not perform a reconstruction of the accident and could not testify as to what obscurements actually existed that night or exactly how long they may have lasted." However, the record does not reflect that Dr. Walton performed an accident reconstruction, nor did he testify as to what obscurements actually existed that night or how long they would have existed. The record does reflect, however that Dr. Dart prepared charts showing "cones of obscurement." The majority's declaration suggests that the trial court was correct in disregarding Dr. Dart's testimony and that the trial court made a credibility determination and chose between two permissible views of the evidence. However, a thorough review of the record establishes that this is not the case.
Dr. Walton testified that some degree of visual obscurement exists at all intersections, but conceded that the obscurement at this intersection is greater than normal. (R. at 1470). Dr. Walton concluded that the geometric configuration of the intersection was not a defect, (R. at 1481), and that Dr. Dart's proposed solution would worsen the geometrics by creating a situation where some vehicles turning at the intersection would encroach upon the center lines. (R. at 1415). Dr. Walton admitted, however, that the encroachment problem already exists. (R. at 1472). Likewise, Dr. Walton admitted that Dr. Dart's proposed solution would give left turning motorists a better line of sight. (R. at 1475).
Such admissions and concessions on the part of Dr. Walton undermined his ultimate conclusion that the misalignment of the intersection does not create an unreasonably dangerous condition. Consequently, although his testimony on direct examination appears to conflict with that of Dr. Dart, his testimony as a whole does not compel a finding that the geometric configuration of the intersection is not unreasonably dangerous. To make a bold declaration that the intersection in question does not create an unreasonable risk of harm to left turning motorists is not compelling, if that same expert acknowledges in the next breadth that the declarations of an expert espousing a contrary position are true. Therefore, in my view, the court of appeal was correct in reversing the judgment of the trial court, as the trial court's findings on this issue were not reasonable in light of the record reviewed in its entirety. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993). In my view, the trial court was not presented with two permissible views concerning whether a defect existed, when one meticulously evaluates the testimony of the experts and examines with a discerning eye the photographs, the map and the diagrams all of which are a part of the record, one must conclude that the intersection is unreasonably dangerous to left turning motorists.
While discounting Dr. Dart's testimony on the one hand, the majority relies on a portion of his testimony wherein he testified that due to the geometric configuration of the intersection, it could take a driver slightly longer to complete a left turn than it would in a non-offset intersection, depending on the speed of the approaching vehicle. See majority opinion at 1312, note 9. In my view, this is a concession that Dr. Dart's characterization of the intersection is correct.
The majority declares that it was not necessary for the trial court to have chosen between the experts because the facts alone provide a basis for the trial court's decision. However, as I have pointed out, the majority addresses only those portions of the record that support the result reached; this is the same error committed by the trial court and which formed the basis of court of appeal decision, reallocating fault.
*1316 There have been cases expressing great concern and making dire predictions whenever the negligence of the DOTD has been the focus of a tort action. See Manasco v. Poplus, 530 So.2d 548 (La.1988) (declaring the financial impossibility of bringing all the state's roads up to modern standards); Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986) (Dennis, J., dissenting, questioning whether the dire financial condition of our state and the possible inability of the DOTD to maintain highways in a reasonably safe condition, should protect the DOTD from the normal effects of civil procedure and delictual law); Usry v. La. Dept. Highways, 402 So.2d 240 (La.Ct.App. 4th Cir.1981), writ denied, 404 So.2d 1259 (La. 1981) (to impose a burden upon the state of having to update its thousands of miles of highways would be an impossible one to fulfill). However, the Louisiana Constitution of 1974, makes it undeniably clear that the state must shoulder its responsibilities in this area. Prior to this time, the state escaped liability at the whim and caprice of the legislature (all too frequently based upon political ties). The redactors of the Louisiana Constitution of 1974 specifically addressed the question.[5] Only an expression of the Legislature and confirmation by a vote of the people can change this positive declaration in our Law.
In the instant case, the court of appeal reviewed the record including the exhibits and concluded that it is readily apparent, even to a lay person that this intersection presents an unreasonable risk of harm to left turning motorists. The court of appeal correctly found that the trial court was clearly wrong in finding no liability on the part of the DOTD when the record clearly does not support the trial court's finding. The view of the evidence presented by Dr. Walton was contradicted to the degree that adoption of that view by the trial court constituted manifest error. The judgment of the court of appeal is logical, correct and just and it follows the law and jurisprudence as it has evolved since the 1974 enactment of our State Constitution.
For the reasons assigned hereinabove, I respectfully dissent.
NOTES
[*] Marcus, J., not on panel. See La.S.Ct. Rule IV, Part II, § 3.

Judge Charles A. Marvin, Chief Judge, Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis.
[1] Main Street is a part of and continuation of La. Highway 31.

Bridge Street is a part of and continuation of La. Highway 96.
[2] La.C.C. art. 2315 states in part:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
[3] La.C.C. art. 2317 provides in part:

We are responsible, not only for the damages occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
[4] Theriot v. Lasseigne, 624 So.2d 1267 (La.App. 3rd Cir.1993).
[5] Although the trial court did not mention the alcohol consumption of the drivers in its reasons for judgment, and no expert testimony was presented regarding the effects of the alcohol consumption on the judgment of either Courville or Lasseigne, the trial court could have reasonably found that the alcohol consumption may have played a role in the combined negligence of the parties. Expert testimony is not necessary when a factfinder can reasonably draw inferences based on his own knowledge and experience. See La.Code Evid. art. 701, 702. See also, Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
[6] Duty-risk analysis is frequently used in resolving questions of negligence. As we recently set forth in Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289, 292 (La.1993), there are four questions which must be considered in applying duty-risk analysis:

1) Was the conduct in question a cause-in-fact of the resulting harm?
2) What if any, duties were owed by the respective parties?
3) Were the requisite duties breached?
4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Id. at 292. See also, Mart v. Hill, 505 So.2d 1120 (La.1987).
Under strict liability, the plaintiff must prove "1) the thing which caused the damage was in the custody of the defendant; 2) the thing contained a "defect (i.e., it had a condition that created an unreasonable risk of harm to the plaintiff); and 3) the "defective" condition of the thing caused the plaintiff's injuries." Oster v. Department of Transportation & Development, 582 So.2d 1285, 1288 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Loescher v. Parr, 324 So.2d 441 (La.1975).
[7] Under each scenario, the assumption was made that the windows of the vehicle which preceded the Courville vehicle through the intersection would be darkened to the point headlights or other vehicles would not be visible through them.
[8] He concluded that the intersection is unreasonably dangerous in normal use because there is an obscurement every time one vehicle precedes another through the intersection.
[9] Dr. Dart testified that due to the offset nature of the intersection it could take a driver slightly longer to complete a left turn than at a non-offset intersection, depending on the speed of the turning vehicle.
[1] Plaintiffs' Exhibit 2-18.
[2] Plaintiffs' Joint Exhibit J-19.
[3] Plaintiffs' expert, Dr. Olin K. Dart, testified that the column of the building at the intersection was too close to the roadway to comply with the current 1½ foot set back requirement for rights of way.
[4] This building was damaged in the accident at issue in this case and had been damaged in two previous accidents according to the testimony of Mayor Kathleen Willis. Following the death of Mayor Earl Willis, his widow, Mrs. Kathleen Willis, became mayor of St. Martinville.
[5] Article XII, § 10(A) provides: "Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property."