775 So.2d 1252 (2000)
Lajuana B. PETRE
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Vincent Petre
v.
State of Louisiana, Through the Department of Transportation and Development.
Nos. 00 00545-CA and 00 00546-CA.
Court of Appeal of Louisiana, Third Circuit.
December 29, 2000.
Rehearing Denied February 28, 2001.
*1255 Henry Howard Lemoine, Jr., Attorney at Law, Pineville, LA, Counsel for Lajuana B. Petre.
Wilbert Joseph Saucier, Jr., Attorney at Law, Pineville, LA, Counsel for Vincent Petre (in cons. case).
John Claiborne Young, Assistant Attorney General, Baton Rouge, LA, Counsel for State of LA, thru DOTD.
Field Vernon Gremillion, III, Attorney at Law, Alexandria LA, Counsel for Lajuana B. Petre.
John Henderson Ayres, III, Litigation Division, Baton Rouge LA, Counsel for State of LA, thru DOTD.
(Court composed of JOHN D. SAUNDERS, JIMMIE C. PETERS, and GLENN B. GREMILLION, Judges).
PETERS, Judge.
These consolidated personal injury and wrongful death claims arise from a one-vehicle accident which occurred in Avoyelles Parish, Louisiana, at approximately 9:20 p.m. on September 1, 1992. In that accident, Lajuana B. Petre sustained severe personal injuries and her ten-year-old daughter, Shanah Brooke Petre, was killed. Ms. Petre instituted suit against the State of Louisiana, through the Department of Transportation and Development (DOTD), to recover for her injuries and for the wrongful death of her daughter. Subsequent to the filing of that suit, Vincent Petre, Ms. Petre's former husband and Shanah's father, filed a separate suit to recover for the wrongful death of his daughter and for certain special damages. Mr. Petre named Ms. Petre and Louisiana Indemnity Company, Ms. Petre's liability insurer, as party defendants in addition to DOTD. After the cases were consolidated, Mr. Petre dismissed his claim against the liability insurer but reserved all rights against the remaining defendants.
The trial on the merits resulted in a judgment in favor of Mr. Petre and against both Ms. Petre and DOTD in the total amount of $259,120.95[1] and in favor of Ms. Petre and against DOTD in the total amount of $559,430.59.[2] Additionally, the trial court found Ms. Petre and DOTD equally at fault in causing the accident and resulting injuries and reduced the awards accordingly. DOTD timely appealed the judgment, asserting five assignments of error. For the following reasons, we affirm *1256 the trial court judgment in all respects.

DISCUSSION OF THE RECORD
The accident occurred on La. Hwy. 107 when Ms. Petre's northbound 1991 Buick Regal automobile left the paved portion of the highway, traveled 131 feet along the shoulder and ditch adjacent to the highway, became airborne and traveled an additional 122 feet. The vehicle ultimately came to rest upside down on a stump. An ambulance transported both Ms. Petre and Shanah to Rapides Regional Medical Center (Rapides Regional) in Alexandria, Louisiana, where Ms. Petre received medical treatment. However, Shanah did not survive.
In the general area where this accident occurred, La. Hwy. 107 is a two-lane, asphalt-surface highway running generally north and south through Avoyelles and Rapides Parishes. It became a part of the Louisiana state highway system in the 1920's and apparently remained a gravel highway until 1952, when it received an asphalt surface. Additional construction in 1987 widened the travel lanes by two feet at the expense of the shoulder width. DOTD classified the highway as a major rural collector highway.
Ms. Petre's accident occurred in a curve located just south of the boundary separating Avoyelles and Rapides Parishes. If one were to proceed north on La. Hwy. 107 in the area of the parish dividing line, he would encounter two back-to-back curves immediately before entering Rapides Parish. The highway first curves to the left and then back to the right before straightening out. The approach to the area from either direction is marked by yellow diamond-shaped warning signs depicting the curve configuration. Attached to each warning sign is a yellow square sign advising that the curves be navigated at forty miles per hour. Ms. Petre was traveling north toward the parish line and had entered the southernmost curve when her right tires left the asphalt surface of the highway. The ground to the right of the paved surface where she left the paved highway consists of a narrow shoulder which quickly drops off into a ditch. Approximately 133 feet north of the point where Ms. Petre left the paved surface is a driveway which runs perpendicular to the highway. The driveway traverses a culvert through which water from the ditch drains down the highway right-of-way.
On September 1, 1992, La. Hwy. 107 had no special warning signs in the area except those previously mentioned. However, that had not always been the case. Between 1985 and 1988, DOTD had initiated a "substandard road program" wherein each district administrator was instructed to post yellow diamond-shaped warning signs bearing the notation "DRIVE CAREFULLY SUBSTANDARD ROADWAY" on locations representing the most dangerous ten percent of the highway area under his jurisdiction. The program also required a corresponding reduction in the speed limit in the areas selected for special signing. Selection of the sections to be specially signed was left to the discretion of the district administrator. According to Lacy Glascock, DOTD's deputy secretary, it was DOTD's intent that the administrator "address very curvy local rural roads that had a history of accident problems." However, Mr. Glascock testified that the administrator was actually instructed to identify and sign approximately ten percent of the system under his jurisdiction that fit in the "worst-type category."
Under the program, the administrator overseeing the district which included La. Hwy. 107 chose the area of the curves at issue to be signed. In addition to posting the special warning signs at the ends of the two curves, the district administrator had signs posted reducing the speed limit through the curves from fifty-five to forty-five miles per hour. Without considering the effect of the program on location safety, DOTD abandoned the program in 1990 and instructed its district administrators to phase out the signs. By September *1257 1, 1992, the special warning signs had been removed and the speed limit had been reestablished at fifty-five miles per hour.
Ms. Petre presented the only eyewitness testimony to the accident and the events leading up to it. She testified that on September 1, 1992, she resided in Pineville, Rapides Parish, Louisiana, and worked at Pinecrest State School. On that day, she worked the 6:00 a.m. to 2:00 p.m. shift and, after work, initially went home. Later that afternoon, she and Shanah accepted an invitation from Regina Smith to visit her home in the Tioga community of southern Grant Parish. According to Ms. Petre, they arrived at Ms. Smith's home between 6:00 and 6:30 p.m. and remained there until approximately 8:30 p.m. Ms. Petre acknowledged that, during her stay at the Smith home, she consumed three mixed drinks, each containing three ounces of bourbon whiskey.
From the Smith home, Ms. Petre drove to the Kingsville[3] Burger King restaurant where Shanah ate a hamburger and french fries. Ms. Petre and Shanah then left the restaurant, intending to travel to the residence of Denise Duhon located on La. Hwy. 107 in Avoyelles Parish, immediately south of the Rapides/Avoyelles Parish line. According to Ms. Petre, this entailed a twenty-mile trip.
Ms. Petre initially inadvertently passed the driveway to the Duhon home. She testified that, although she had traveled La. Hwy. 107 in the past, her trips had been during daylight hours and that she did not travel the highway on a regular basis. She continued south to an abandoned store located on the left side of La. Hwy. 107, which she described as being located approximately three blocks past the Duhon residence.
Ms. Petre used the store parking lot to turn around, and she then reentered the highway, intending to return to the Duhon residence. The abandoned store is located north of the highway warning sign on the south side of the reverse curve. Therefore, when she reentered the highway, she was not exposed to the same warning which she had seen while traveling south. She testified that, as she proceeded north, she encountered a vehicle traveling south, which she thought might be Ms. Duhon's vehicle. According to Ms. Petre, as she glanced to her left at the other vehicle, the right side of her car left the paved surface of the highway. She estimated that she was traveling at a speed of forty to forty-five miles per hour at that time. Ms. Petre also testified that, as the wheels dropped off the paved surface, "I took the ditch and it just kept going straight and I tried to pull it up to the left to try to get my wheels back up and I couldn't even get it up out of the ditch until we hit a culvert." Actually, the physical evidence suggests that Ms. Petre did not strike the culvert. Instead, her vehicle traversed the driveway between the culvert and the paved surface of La. Hwy. 107. The driveway slope, which ran perpendicular to the highway and ditch, acted as a launching ramp, causing her vehicle to become airborne.
Ms. Petre testified that nothing forced her from the paved surface. She simply glanced away for a second and immediately left the paved surface. She testified that she did not recall applying her brakes but did recall attempting to turn back onto the highway. Although she was not certain, she believed she tried to accelerate in an effort to return to the highway. Ms. Petre had no memory of the events from final impact until she regained consciousness in Rapides Regional two days later.
At 9:42 p.m., Louisiana State Trooper Nathaniel Beaubouef arrived at the accident scene and found the local fire department already in the process of removing Ms. Petre and Shanah from the wrecked vehicle. He located the point at which Ms. Petre's vehicle left the paved surface and, from this reference point, took the *1258 necessary measurements to determine the vehicle's path to its final resting place. Trooper Beaubouef examined the highway surface. The absence of marks on the paved surface caused Trooper Beaubouef to conclude that the vehicle was under control when it left the highway and that the accident was caused by Ms. Petre's inattentiveness. Based on this conclusion, he issued Ms. Petre a citation for careless operation of a vehicle, a violation of La. R.S. 32:58.
Acadian Ambulance Service, Inc. provided the emergency transportation for both Ms. Petre and Shanah. The emergency unit arrived at the accident scene at 9:53 p.m., left the scene at 10:09 p.m., and arrived at Rapides Regional at 10:29 p.m. Rapides Regional personnel obtained a blood sample from Ms. Petre at 11:05 p.m. When tested, this sample yielded a blood-alcohol reading of 0.249 percent based on grams of alcohol per 100 cubic centimeters of blood. Ms. Petre ultimately pled guilty to vehicular homicide, a violation of La. R.S. 14:32.1, in connection with the death of Shanah.
After a bench trial, the trial court issued written reasons for judgment. In those reasons, the trial court accepted as fact Ms. Petre's testimony concerning the accident. Based on Ms. Petre's testimony and the other evidence presented, the trial court concluded that La. Hwy. 107 had "no shoulders paved or otherwise" in the area of the accident and that the plaintiffs had proven by a preponderance of the evidence the elements necessary to establish DOTD's fault in causing the accident. Additionally, the trial court considered the actions of Ms. Petre and found her equally at fault in causing the accident.
In its appeal, DOTD asserts that the trial court erred (1) in concluding that La. Hwy. 107 was so defective at the point of the accident that it created an unreasonable risk of harm, (2) in concluding that any unreasonably dangerous condition within DOTD's control was a cause of or substantial factor in causing the accident and subsequent injuries, (3) in concluding that any legal duty owed by DOTD encompassed the risk of injury or death caused by the gross negligence of a motorist and in imposing any degree of fault on DOTD, (4) in admitting evidence of a previous accident and of post-accident remedial measures, and (5) in awarding Ms. Petre excessive damages for her individual pain and suffering.

APPLICABLE LAW
In their petitions, the plaintiffs premised the right to recover on the legal theories of negligence and strict liability. To prove negligence, they were required to prove that (1) a defect in La. Hwy. 107 created an unreasonable risk of injury that caused the injuries to the occupants of the vehicle, (2) DOTD knew or should have known of such risk, and (3) DOTD failed to take adequate steps to prevent the damage. La.Civ.Code art. 2315; Rhodes v. State, Through Dep't of Transp. & Dev., 95-1848 (La.5/21/96); 674 So.2d 239. In the negligence action, it is DOTD's knowledge, constructive or actual, which gives rise to a duty to take adequate measures necessary to prevent injury. Id. (quoting Kent v. Gulf States Utils. Co., 418 So.2d 493, 497 (La.1982)). If the owner of a defective thing acts reasonably but still fails to discover the dangerous condition, then he is not liable for damage resulting from it. Id.
At the time this accident occurred, a plaintiff pursuing a strict liability claim was not required to show that the defendant had actual or constructive knowledge of the defect. See La.Civ.Code art. 2317 in effect September 1, 1992.[4] However, when pursuing a public entity under La. Civ.Code art. 2317, the plaintiffs burden *1259 was modified by La.R.S. 9:2800. La.R.S. 9:2800(B) provides in pertinent part as follows:
[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
Therefore, since DOTD is a public entity, the plaintiffs had the same burden of proof under either theory of liability.
Thus, in this instance, both the negligence and strict liability issues are to be evaluated under a duty-risk analysis. In such an analysis, the plaintiffs are required to prove: (1) the conduct in question was the cause-in-fact of the resulting harm, (2) the defendant owed a duty to the plaintiff, (3) the defendant breached this duty, and (4) the risk of harm was within the scope of protection afforded by the duty breached. Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898.

DUTY-RISK ANALYSIS

Cause-in-Fact Element
A finding of cause in fact is essential to proving liability. Theriot v. Lasseigne, 93-2661 (La.7/5/94); 640 So.2d 1305. The cause-in-fact element generally involves a "but for" inquiry which questions whether or not the injury would have occurred "but for" the defendant's substandard conduct. Id. If this inquiry is answered in the negative, then there is no liability. Id. The trial court answered this inquiry in the affirmative in this case. In its reasons for judgment, the trial court specifically concluded that "[a]lthough there are several causes in fact for this accident, the court finds that the defective curvature of the highway, the defective shoulder of the highway and the lack of chevrons delineating the curve were all substantial contributing factors in bringing about the accident and plaintiff's damages." While we will further address the trial court's factual findings concerning the condition of La. Hwy. 107 hereinafter, we find no manifest error in the trial court's conclusion that the highway configuration was a cause in fact of Ms. Petre's accident.

Duty Element
It is not disputed by DOTD that it has a duty to maintain safe highways and shoulders. See Jones v. State, Dep't of Transp. & Dev., 478 So.2d 691 (La.App. 3 Cir.1985), writ denied, 480 So.2d 743 (La. 1986). The supreme court in Graves v. Page, 96-2201 (La.11/7/97); 703 So.2d 566, recognized that DOTD's duty extends past the travel lanes. As explained in Graves,
"[t]he duty to motorists encompasses the foreseeable risk that, for any number of reasons including simple inadvertence, a motorist might find himself traveling on, or partially on the shoulder. A motorist has the right to assume that a highway shoulder, the function of which is to accommodate motor vehicles in emergencies and for other reasons whether intentionally or unintentionally driven thereon is maintained in a reasonably safe condition."
Id. at 572 (quoting Begnaud v. Dep't of Transp. & Dev., 93-639, 93-640 (La.App. 5 Cir. 1/12/94); 631 So.2d 467, 470, writ denied, 94-367 (La.3/25/94); 635 So.2d 230). However, in recognizing the existence of this duty, we also recognize that DOTD is not a guarantor of the safety of those who travel the highways of this state. See Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La.1/14/94); 630 So.2d 1289. DOTD's duty to the traveling public is breached only when the highway at the scene of the accident is found to be in an unreasonably dangerous condition. Id. DOTD's duty to maintain reasonably safe roadways encompasses persons who are foreseeably *1260 placed in danger by unreasonably dangerous conditions. Under our comparative negligence system, even motorists who are slightly exceeding the speed limit, momentarily inattentive, or otherwise negligent may recover from DOTD. Lamaire v. Motor Convoy, Inc., 625 So.2d 638 (La.App. 3 Cir.1993), writ denied, 93-2778 (La.1/7/94); 632 So.2d 754.

Breach-of-Duty Element
Although the issues on appeal are not limited to this element, a primary dispute involves DOTD's assertion that the trial court erred in concluding La. Hwy. 107 contained a defect that created an unreasonable risk of harm to Ms. Petre and her daughter. The trial court's determination in this regard is factual in nature, and we evaluate findings of the trier of fact under the manifest error or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). Particularly when reviewing such a fact-intensive and fact-disputed case as the one now before us, it is often important to remind ourselves of the role this rule plays in the appellate review process. The supreme court's Stobart decision is often quoted on this issue:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La. 1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
*1261 Id. at 882-83.
Additionally, the supreme court recently addressed the significance of the manifest error rule in the context of proper function allocation between the trial and reviewing courts:
In Louisiana's three-tiered judicial system, the function of finding facts is allocated to the trial courts. In Canter v. Koehring, Co., 283 So.2d 716, 724 (La. 1973), this court stated:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Smith v. Toys "R" Us, Inc., 98-2085, pp. 7-8 (La.11/30/99); 754 So.2d 209, 214. Proper deference to the manifest error rule protects a litigant, plaintiff or defendant, from being subjected to multiple trials by preventing the appellate courts from reevaluating and reweighing the evidence to reach an independent decision without giving due deference to the trial court's function. With this reminder of our function, we turn to the evaluation of this element of the duty-risk analysis.
The trial court based its determination that La. Hwy. 107 contained a defect which created an unreasonable risk of harm primarily on the testimony of two experts in the fields of traffic engineering and accident reconstruction. Duaine Evans, of Baton Rouge, Louisiana, testified for the plaintiffs, and Francis H. Wyble of Houma, Louisiana, testified for DOTD.
Mr. Evans concluded that the highway shoulder did not meet the state design specifications in effect in 1952 when the highway was constructed. According to Mr. Evans, as far back as 1943, DOTD (then known as the Louisiana Department of Highways) promulgated standards for highway design and construction for even the lowest classification of highways within the system. Those standards provided that even such minor highways were to be designed with a minimum five foot shoulder,[5] and the highway at issue did not meet even those design specifications. Additionally, according to Mr. Evans, DOTD exacerbated the defect in 1987 when its travel lane widening project reduced the already defective shoulder width by an additional two feet.
Mr. Evans inspected the accident scene in February of 1993 and found the shoulder to provide, at most, one and one-half feet of usable surface before descending into the ditch. Additionally, he discovered that the shoulder contained a "hump" varying in height from one and three-quarters inches to one and one-half inches above the paved highway surface. The slope into the adjacent ditch, according to Mr. Evans, varied from four to one to three to one. While he did not find that the ditch slope violated state design standards, he opined that a three-to-one slope is not recoverable by a vehicle traversing it along the highway right-of-way and that a four-to-one slope is "barely recoverable."
*1262 In Mr. Evans' opinion, if the shoulder had met design standards, the extra width would have been available for the driver to recover. With such a narrow shoulder, "after moving over only a foot and a half, the vehicle was on the slope and from then on the driver could not get it back on the roadway because of that slope." Thus, he was of the opinion that, although within acceptable design standards, the slope also "played a significant part" in causing the accident. Basically, the defective shoulder on the severe curve caused Ms. Petre's vehicle to fall almost immediately into the adjacent ditch. Mr. Evans also testified that, at the time of the accident, the approach to the curve lacked reflective chevrons. In his opinion, had chevrons been present, they would have first warned and then assisted approaching motorists in negotiating the curve.
Mr. Wyble concluded that the accident was caused solely by driver error. He disregarded Trooper Beaubouef's conclusion that Ms. Petre's vehicle was not out of control when it left the paved surface and theorized that, even before that event, the vehicle had begun to yaw. Despite the lack of physical evidence in this regard, he suggested that the right front wheel left the pavement due to "a steering maneuver of some kind" and thereafter "whoever [was] in it [was] just along for the ride." In his opinion, the moment the vehicle began to yaw, the situation became nonrecoverable, primarily because of the curvature of the road, and neither the shoulder nor slope played any part in the accident.
In reaching their conflicting opinions, the experts also disagreed on the basic factual conclusions to be drawn from the evidence presented. Mr. Evans testified that, while it would be impossible to calculate the vehicle's speed when it left the paved surface, the fact that it was mathematically possible to calculate the vehicle's speed when it became airborne allowed him to conclude that Ms. Petre was traveling within the fifty-five mile per hour speed limit when she first left the pavement. Knowing the distance the vehicle traveled while airborne and the slope at the driveway which functioned as a ramp, Mr. Evans was able to calculate the vehicle's speed as it hit the driveway ramp to be forty-three miles per hour.
Mr. Wyble concluded that Ms. Petre could not have accelerated to forty or forty-five miles per hour from the time she turned around at the store until she left the paved surface unless she were to "put the pedal to the metal." However, he presented no evidence to support his speed theory and could only state that "all I know is that at some point if she did turn at the store, she stomped it."
Mr. Evans concluded that all four wheels left the paved surface at some point before the vehicle came into contact with the driveway, but Mr. Wyble disagreed with that conclusion. However, in disagreeing, he pointed to no evidence to support his view and in fact admitted that "I have seen no evidence of it, sir. I've looked it up in the police photos. I don't see it. I think it came close to it but no real physical evidence."
Basically, the experts agreed that once Ms. Petre left the paved surface, she could not regain control. They disagree over why she initially left the paved surface. Accepting Trooper Beaubouef's investigation as accurate, Mr. Evans concluded that the accident began as described by Ms. Petre. Discounting Trooper Beaubouef's testimony that he found no skid, yaw, or gouge marks on the paved surface that might suggest Ms. Petre had lost control of her vehicle before leaving the paved surface, Mr. Wyble concluded that Ms. Petre had performed some drastic "steering maneuver" that caused the vehicle to yaw before leaving the highway.
In applying the first prong of the Stobart analysis to this case, we recognize that reasonable minds can reach conclusions that are still wrong under the manifest error standard. Thus, the first question *1263 to be determined is whether there exists a reasonable factual basis for the trial court's findings of fact. We find that such a factual basis exists in this case. The trial court made certain factual findings concerning the events leading up to the accident as testified to by Ms. Petre and Trooper Beaubouef. It was then presented with expert testimony based on reasonable analysis of those same facts as presented by Mr. Evans, and the trial court accepted Mr. Evans' opinions. While another reasonable fact finder might conclude that Mr. Wyble's analysis was just as reasonable, we find no error in the trial court's rejection of his analysis and opinion. This is supported by the fact that some of his assumptions and conclusions were not supported by the accident scene evidence. "The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). We find no manifest error in the determination that La. Hwy. 107 contained a defect that created an unreasonable risk of injury. Thus, the trial court did not err in concluding that DOTD breached its duty to maintain a safe highway.

Scope-of-Protection Element
In concluding that La. Hwy. 107 contained a defect, the trial court also concluded that the defect "prevented Ms. Petre from recovering control of her vehicle once it left the roadway." Thus, it concluded that the risk of harm to Ms. Petre and Shanah was within the scope of protection afforded by DOTD's duty to maintain safe highways. DOTD asserts that its duty did not extend to the protection of an inattentive, highly intoxicated person leaving the highway.
While no one would take issue with the fact that Ms. Petre's unacceptable and illegal actions in driving while intoxicated should be weighed heavily against her in considering the extent of DOTD's duty to her, intoxication alone is not enough to automatically prevent her from recovering for DOTD's fault. It is merely a factor to consider in Louisiana's comparative negligence scheme. See La.Civ.Code art. 2323. The trial court clearly recognized this and addressed this issue directly in its reasons for judgment by stating that the courts of this state have "not relied solely upon blood tests to close the door and conclude [sic] the intoxicated driver with sole fault in the accident. Rather, they look to other credible testimony which determines the effect of alcohol upon the ability of the driver to operate the vehicle and the extent of the impairment." See Bowens v. Patterson, 97-876 (La.App. 3 Cir. 6/3/98); 716 So.2d 69, writs denied, 98-1807, 98-2283 (La.10/30/98); 727 So.2d 1162 and 728 So.2d 388; Douget v. Allen Parish Police Jury, 520 So.2d 813 (La.App. 3 Cir.1987). The trial court then concluded that Ms. Petre's intoxication was not the sole cause of the accident. The question is whether this finding is manifestly erroneous or clearly wrong.
As with the expert testimony on the other factual issues, the testimony concerning the intoxication issue is conflicting. Dr. Ronald N. Padgett, an Opelousas, Louisiana pathologist, testified on behalf of DOTD concerning the negative effect alcohol has on a person's ability to react. In his opinion, anyone with a blood-alcohol content of 0.04 grams of alcohol per 100 cubic centimeters of blood could be impaired in judgment and actions and someone with a content of 0.20 is "extremely impaired." However, he acknowledged that levels of intoxication vary from person to person and that alcohol tolerance levels vary from person to person and even within the same person. He also acknowledged that his conclusions of impairment were based on the general population, that he never examined Ms. Petre to determine her tolerance level, and that he was not provided with any accurate historical data upon which he could judge Ms. Petre's tolerance for alcohol. Based on the standard absorption rate of alcohol, Dr. Padgett *1264 placed Ms. Petre's blood-alcohol content above 0.20 at the time of the accident.
Mr. Evans and Mr. Wyble did not take issue with Dr. Padgett's analysis but disagreed between themselves concerning how, if at all, intoxication played a part in this accident. Mr. Evans testified that once Ms. Petre left the paved surface, her intoxicated condition played no part in the events which followed, while Mr. Wyble was of the opinion that a sober driver could have recovered. Both agreed that the normal time for a driver to react to the emergency would have been one to one and one-half seconds. Both also agreed that, if Ms. Petre exited the highway at forty-five miles per hour in that one to one and one-half seconds, she would have traveled somewhere between 66 and 100 feet. In other words, she would have traversed more than half the distance between the point she left the highway and the culvert and driveway before she could even react to regain control. With such a minimal reaction time, Mr. Evans testified that even a sober person would not have been able to recover. He found Ms. Petre's actions in responding to her situation entirely appropriate and testified that, even if she timely reacted and locked her brakes, the vehicle would have rotated into the ditch and still would probably have hit the driveway as it did.
In considering all the evidence presented, the trial court made the following statement in its reasons for judgment:
The record bears out Ms. Petre was traveling south on Louisiana Highway 107 before the accident and had successfully driven through this curve before the accident occurred. She then turned her vehicle around and attempted to negotiate the curve while heading north on Highway 107. It is further noted by the court that she had driven from the Tioga/Ball area and through Pineville before reaching the scene of the accident, all without mishap, a distance of approximately twenty miles.
We again apply the two-prong Stobart manifest error test to the trial court's factual findings on this issue and, while reasonable minds might disagree and reach other conclusions, we find no manifest error.
Summarizing the opinion to this point, we conclude that the trial court did not err in finding that the condition of La. Hwy. 107 at the point of the accident in question was a cause-in-fact of the accident and resulting harm, that DOTD owed a duty to the plaintiffs to maintain safe shoulders on La. Hwy. 107, that DOTD breached that duty by maintaining a defectively designed and constructed shoulder at the accident location which created an unreasonable risk of injury to Ms. Petre and her daughter, and that the risk of harm to the plaintiffs was within the scope of protection afforded by the duty breached.

La.R.S. 9:2800 Burden
As previously stated, plaintiffs pursuing a negligence or strict liability cause of action against DOTD must also prove that DOTD knew or should have known of the risk and that it failed to take adequate steps to prevent the damage. DOTD does not raise the lack of proof on this issue directly but complains in an assignment of error that the trial court erred in admitting certain evidence of a prior accident and post-accident remedial measures. The prior-accident evidence complained of by DOTD related to a 1987 fatal accident at the exact location of Ms. Petre's accident. DOTD argues that the 1987 accident was caused by a pothole in the highway and that the only similarity was that both accidents involved intoxicated drivers. In making this argument, DOTD ignores the fact that the evidence was presented for the limited purpose of showing knowledge of and opportunity to remedy the defect on the part of DOTD. Mr. Evans was involved on behalf of the plaintiff in the investigation of the 1987 accident, and Dr. Olin Dart, a Baton Rouge, Louisiana traffic engineering and *1265 accident reconstruction expert, investigated the accident on behalf of DOTD. Dr. Dart testified that in 1988 he investigated the accident scene, took pictures and measurements, and reported his findings and recommendations to DOTD. Mr. Evans testified that the scene had not changed since his 1988 inspection.
We find that the trial court did not err in admitting the evidence for the limited purpose of satisfying the special requirements of La.R.S. 9:2800. Such testimony and evidence is particularly important when DOTD exerts its privilege against producing information through discovery under 23 U.S.C. § 409, as it did in this case. Thus, we find that the requirements of La.R.S. 9:2800 are at issue only indirectly and conclude that the plaintiffs did prove by a preponderance of the evidence that DOTD knew or should have known of the defective shoulder and failed to take adequate steps to prevent the accident by repairing the defect.

POST-ACCIDENT INSTALLATION OF CHEVRONS
In one of its assignments of error, DOTD asserts that the trial court erred in admitting evidence concerning the placing of chevrons in the curves after Ms. Petre's accident. The plaintiffs correctly point out that the testimony concerning the chevrons was admitted without contemporaneous objection. Therefore, DOTD cannot now raise the issue on appeal. See La. Code Evid. art. 103.

COMPARATIVE FAULT
Both the determination and apportionment of fault in negligence cases are factual matters and are therefore to be analyzed under the manifest error or clearly wrong standard. Stephens v. Town of Jonesboro, 25,715, 25,716 (La.App. 2 Cir. 8/19/94); 642 So.2d 274, writs denied, 94-2351, 94-2557, 94-2577 (La.11/29/94); 646 So.2d 400. In evaluating a question of fault, the trier of fact must analyze "the fault of the parties in causing the harm" to the plaintiff as well as the accident itself. Campbell, 648 So.2d at 902; see also Boutte v. Nissan Motor Corp., 94-1470 (La.App. 3 Cir. 9/13/95); 663 So.2d 154.
In determining whether the trial court was clearly wrong in its apportionment of fault, reference should be made to the factors enunciated in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967, 974 (La.1985):
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
A trier of fact could certainly conclude that, while Ms. Petre's conduct was through mere inadvertence, her conduct in operating a vehicle while intoxicated is conduct in which the actor should be held to an awareness standard. However, DOTD had a special awareness of the danger of this particular curve configuration as it had been analyzed by its own experts in 1988, and its district administrator selected it as being in the "worst-type category" during DOTD's "substandard road program" in effect between 1985 and 1988. Thus, a reasonable trier of fact could conclude that each bore an equal responsibility in this category.
The same conclusion could be derived from an analysis of the second Watson factor, the degree of risk created by the *1266 actions of each actor. Certainly Ms. Petre's intoxicated condition created an unacceptable risk as did DOTD's failure to remedy a hazardous situation.
In our opinion, the Watson factor addressing the significance of what was being sought by each actor balances in favor of DOTD. Ms. Petre placed herself and her daughter in danger for the purpose of visiting a friend, an event which easily could have been postponed. Still, DOTD had over four years in which to remedy a defect in its highway.
While we find that DOTD is in a superior position to remedy the dangerous highway defect, we must also acknowledge that certainly Ms. Petre's own actions could have prevented this accident had she not traveled the highway under the influence of alcohol. Still, that only addresses part of the accident-causation issue. The trial court clearly concluded that, once Ms. Petre left the paved surface, her intoxication played no part in the remainder of the accident. Thus, the analysis of the cause of the harm as suggested in Campbell, 648 So.2d 898, must be applied. In doing so, we conclude that this factor favors Ms. Petre.
There is nothing to suggest that either actor was subjected to any extenuating circumstance that might have required proceeding without proper thought and in haste. As previously stated, Ms. Petre was not on a required mission or one that could not have been put off to another day. Also, DOTD had years to remedy the defect.
While not specifically mentioning the Watson factors, the trial court concluded that Ms. Petre and DOTD were equally at fault in causing the accident. While we might well have reached a different conclusion on the apportionment of fault, we find no manifest error in that conclusion. With this finding, we reject DOTD's first four assignments of error as being without merit.

DAMAGE AWARD
In its final assignment of error, DOTD complains only of the damage award to Ms. Petre for her general damages. The discretion vested in the trier of fact in awarding general damages is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of a case that the appellate court should increase or reduce the award. Id. We find no abuse of discretion in the award to Ms. Petre of general damages in the amount of $272,000.00 and reject this assignment of error.

DISPOSITION
For the foregoing reasons, we affirm the trial court's judgment in all respects. Pursuant to La.R.S. 13:5112, the costs of this appeal are taxed against the Louisiana Department of Transportation and Development and are fixed at $126.00 for each suit for a total of $252.00.
AFFIRMED.
NOTES
[1] The trial court awarded Mr. Petre $250,000.00 on the wrongful death claim for the loss of his daughter and $9,120.95 in special damages.
[2] The trial court awarded Ms. Petre $250,000.00 on the wrongful death claim for the loss of her daughter, $272,000.00 in general damages for her own injuries, and $37,430.59 in special damages.
[3] Kingsville is a community lying between Pineville and Tioga.
[4] By Acts 1996, 1st Ex.Sess., No. 1, § 1, the Louisiana Legislature added La.Civ.Code art. 2317.1, which adds a knowledge requirement similar to that required in La.R.S. 9:2800(B) on the part of the owner of the thing.
[5] As previously stated, La. Hwy. 107 is classified as a major rural collector highway. Thus, its classification is neither the highest nor the lowest.