JUDE G. GRAVOIS, Judge.
12Plaintiffs, Claiborne Medical Corporation and Dr. Fiaz Afzal, have appealed a trial court judgment which granted some of the relief requested by plaintiffs and denied some of the relief requested by plaintiffs. For the reasons that follow, we affirm the judgment of the trial court under review.

PROCEDURAL HISTORY AND FACTS

This matter has a rather convoluted procedural history. On February 18, 2010, plaintiffs, Claiborne Medical Corporation (“Claiborne Medical”) and Dr. Fiaz Afzal, filed a “Petition for Injunctive and Incidental Relief,” seeking to enjoin Gul-naz Siddiqui, Dr. Afzal’s sister-in-law and former employee of Dr. Afzal’s medical practice (Claiborne Medical), from entering the premises of Claiborne Medical or disrupting its business in any manner.[1] *463 Ms. Siddiqui filed an Answer, Reconven-tional Demand, and Shareholder’s Derivative Action on February 25, 2010, in which she sought a judicial declaration that she held a 50 percent ownership interest in Claiborne Medical. She sought damages for emotional trauma and distress, as well as physical trauma caused when she was arrested after Dr. Afzal called the police to remove her from the medical clinic. Additionally, she sought economic damages based on income of Claiborne Medical allocated to her. Plaintiffs responded by filing an amended petition on April 19, 2012, naming as additional defendants Ahmad Siddiqui, Ms. Siddiqui’s husband (also a former employee of Claiborne Medical), Siddiqui and Af-zal, L.L.C., and Days Inn of Kenner, L.L.C. The amended petition alleges that certain business transactions and property transfers were confected by Dr. Afzal under duress as a result of threats and/or misrepresentations made by the Siddiquis surrounding Dr. Afzal’s immigration status. In the amended petition, plaintiffs seek: (1) a judicial declaration that Dr. Afzal is the sole owner of Claiborne Medical; (2) a judicial declaration that Claiborne Medical is the sole owner of two parcels of property in Kenner, Louisiana; (3) reimbursement of nonwage amounts paid to the Siddiquis; (4) judgment against Mr. Siddiqui in the amount of $50,000 for repayment of a previous loan; (5) the dissolution of certain transfers of property from Claiborne Medical to Afzal and Siddiqui, L.L.C. and Days Inn of Kenner, L.L.C.; (6) damages relating to payments made by Claiborne Medical in connection with investment loans not related to its medical practice; (7) reimbursement of $230,000 paid by Claiborne Medical on behalf of defendants for arehi-tectural and other services; and (8) damages for Dr. Afzal’s emotional distress resulting from the Siddiquis’ intimidating actions.
Plaintiffs filed a motion for partial summary judgment on the issue of Ms. Siddi-qui’s alleged ownership interest in Claiborne Medical. On January 3, 2011, the trial court granted plaintiffs’ motion, declaring that the purported transfer of 50 ^percent ownership interest in Claiborne Medical to Ms. Siddiqui was an absolute nullity, and that Ms. Siddiqui, as a non-physician, is prohibited by law from holding an ownership interest in any medical corporation. Ms. Siddiqui sought review of that ruling in this Court, which denied relief, holding that La. R.S. 12:901, et seq., prohibits ownership of stock in a medical corporation by a person not licensed to practice medicine; thus the contract to transfer ownership of Claiborne Medical to Ms. Siddiqui, a non-physician, was an absolute nullity. Claiborne Medical Corporation v. Gulnaz Q. Siddiqui, 11-234 (La.App. 5 Cir. 4/27/11) (unpublished writ disposition).
The matter eventually proceeded to a three-day judge trial. At trial, Dr. Afzal testified that he is a medical doctor, that he came to the United States from Pakistan, that he is licensed to practice medicine in Louisiana, and that he is married to Shahida Shuja, Ms. Siddiqui’s sister. In 1996, Dr. Afzal began practicing medicine in Louisiana in association with Dr. Robert Lesser. In 1998, he left Dr. Lesser’s practice and began practicing at one of Dr. Lesser’s former offices on Claiborne Avenue in New Orleans.
Prior to coming to Louisiana, Dr. Afzal had applied for and was denied political asylum in this country. He then sought an H1B visa, which is a non-immigrant visa *464 which allows United States employers to employ workers in specialty occupations, including physicians. According to the testimony adduced at trial, this visa must be renewed every three years. In order to continue his H1B visa status in 2000, Dr. Afzal formed Claiborne Medical, by whom he was employed. He had previously hired Ms. Siddiqui, who holds a master’s degree in public health, as the medical director of his clinic. Ms. Siddiqui signed certain documents in connection with Dr. Afzal’s visa application, stating therein that he was employed by Claiborne Medical. Dr. Afzal’s H1B visa was approved in 2002 Rand extended to March 2005. Dr. Afzal received permanent residency status in the United States in 2007.
Admitted into evidence were documents dated May 28, 2005, which include a corporate resolution making Ms. Siddiqui a 50 percent co-owner of Claiborne Medical. Ms. Siddiqui was also listed as the registered agent of Claiborne Medical.
In August of 2005, Claiborne Medical’s building was destroyed by Hurricane Katrina. Shortly thereafter, Dr. Afzal purchased a home in Lafayette, Louisiana, and began practicing medicine there with another doctor. In November 2005, he moved to Kenner, Louisiana, and resumed practicing medicine under Claiborne Medical, in a building located at 1000 Veterans Blvd., which was owned by Mr. Siddiqui and his relatives (under the name of Siddi-qui Group Investments). Claiborne Medical eventually purchased the building and Dr. Afzal continued his medical practice at that location. Ms. Siddiqui continued her employment with Claiborne Medical.
Ms. Siddiqui came to the United States in 1984 and became a United States citizen in 1990. She testified that in 1998, when she went to work for Claiborne Medical, her salary was about $28,000 per year. Throughout her employment, she worked 40 hours per week and her duties included taking heights, weights, and blood pressures, listing patient complaints, and conducting birth control counseling.
Ms. Siddiqui testified that in 2000, Dr. Afzal’s visa had expired and he was issued “deportation orders” from a New York court. At that time, Dr. Afzal asked her to sign documents for his immigration. In 2002, she signed documents on behalf of Claiborne Medical as Dr. Afzal’s employer for Dr. Afzal’s H1B visa | ^application. This visa was granted in 2002. In 2005, Dr. Afzal transferred a 50 percent ownership interest in and to Claiborne Medical to Ms. Siddiqui.
Ms. Siddiqui testified that Mr. Siddiqui (her husband) owned a Thrifty car rental franchise in Kenner. In April of 2005, he had to sell the franchise because the Thrifty and Dollar car rental companies merged, terminating Mr. Siddiqui’s franchise agreement. Ms. Siddiqui did not recall receiving a $50,000 loan from Claiborne Medical in April of 2005. Ms. Siddi-qui admitted that she and Mr. Siddiqui had financial difficulties after Hurricane Katrina.
Ms. Siddiqui testified that Dr. Afzal had to move back to the New Orleans area to work after Hurricane Katrina because of his “immigration status.” She explained that he was prohibited from working for anyone other than Claiborne Medical. The building located at 1000 Veterans Blvd. was leased prior to Hurricane Katrina, but was vacant after the hurricane. In order for a medical clinic to be operated in that building, it had to be renovated. The renovations were paid for by Mr. Siddiqui and Dr. Afzal. Ms. Siddiqui continued her employment with Claiborne Medical after the practice moved to Kenner.
Ms. Siddiqui explained that certain loans were available to Claiborne Medical after *465 Hurricane Katrina, which Dr. Afzal applied for and received. She denied that Mr. Siddiqui assisted Dr. Afzal in applying for the loans. She stated that in order to obtain those loans, the owner of Claiborne Medical had to be a United States citizen.
Sometime in 2007, Mr. Siddiqui decided to build a hotel adjacent to the medical clinic. Numerous documents were admitted into evidence showing that the Siddi-quis and Claiborne Medical purchased numerous parcels of land adjacent to the medical clinic. These documents show that in April 2006, the Siddiquis purchased a lot next to the clinic for $85,000. Ms. Siddiqui was not sure where |7they obtained the funds for this purchase. In September 2006, ownership of this lot was transferred to Claiborne Medical. Several other adjacent lots were purchased by Claiborne Medical in 2006 and 2007. Ms. Siddiqui admitted that all funds to purchase these lots came from Claiborne Medical, but she contends that since she was a 50 percent owner of Claiborne Medical, she actually paid 50 percent of the purchase price. She explained that Dr. Afzal had complete control of the checking account of Claiborne Medical; she did not have any access to Claiborne Medical’s financial records or checking accounts.
On March 28, 2007, Siddiqui and Afzal, LLC was formed to develop the hotel. All of the property that had been purchased by Claiborne Medical was transferred to this LLC. The Siddiquis and Dr. Afzal and his wife each had a 50 percent ownership interest in this LLC. The property of Sid-diqui and Afzal, LLC was later transferred to a new entity, Days Inn of Kenner, LLC. Documents introduced into evidence show that the Siddiquis had a 60 percent ownership interest in this LLC, while Dr. Afzal and his wife had a 40 percent ownership interest in this entity.
In 2007, Mr. Siddiqui started working for Claiborne Medical at a salary of $2,000 per month. Documents were admitted into evidence showing that Claiborne Medical paid Mr. Siddiqui $78,000 in 2008 and $93,000, in 2009. Ms. Siddiqui. testified that sometimes Dr. Afzal wrote checks out to Mr. Siddiqui which included a portion of Ms. Siddiqui’s salary. She claims that after the medical office moved to Kenner, Dr. Afzal agreed to pay her a salary of $4,000 per month. Mr. Siddiqui stopped working for Claiborne Medical in December 2009. Ms. Siddiqui stopped working for Claiborne Medical in February 2010 when Dr. Afzal summoned the police and had her -arrested for being on the clinic premises. Ms. | sSiddiqui testified that she “may have” signed a complaint with the Justice Department regarding Dr. Afzal several months after her discharge.
Ahmad Siddiqui testified that he was born in Pakistan and had been a United States citizen since 1988. He holds degrees in political science and law and was a lawyer and a university professor in Pakistan. From 1987 until 1991, he owned a gift shop in the French Quarter. In 1991, he bought a Shell gas station which he operated until Shell Oil Company bought it from him in 1998. In 1996, he purchased the Thrifty car rental franchise which he sold in 2005. He explained that he, five of his brothers, and two of his nephews formed Siddiqui Group Investors (“SGI”) on December 21, 1995. As executive vice president of SGI, he operated some businesses, including the Shell station and the Thrifty car rental agency, on behalf of SGI.
In March of 2001, SGI purchased lots 89 and 98 of a subdivision in Kenner. These lots were sold to Claiborne Medical in 2006. In August 2001, SGI purchased lots 15 and 16 of a subdivision in Kenner. This is the property which contains the clinic *466 building for Claiborne Medical. These lots were re-subdivided into one lot in March of 2004.
Mr. Siddiqui testified that Ms. Siddiqui went to work for Claiborne Medical in 2000 and signed documentation for Dr. Afzal’s visa application stating that Dr. Afzal was employed by Claiborne Medical. According to Mr. Siddiqui, Dr. Afzal could have been deported without Ms. Siddiqui’s signature.
At trial, Mr. Siddiqui testified that after the Thrifty franchise was bought out, he and SGI received money and rent for their property. Mr. Siddiqui explained that his deposition testimony wherein he stated that he did not receive any money from the sale of the Thrifty franchise was not accurate. He admitted that he received a check for $50,000 from Claiborne Medical on April 6, 2005, and that |9this check was deposited into his personal checking account. He explained that this was a deposit for a hotel that he and Dr. Afzal planned to purchase in Slidell. He denied that there was an agreement for him to pay this money back. He then testified that “after some time,” he considered this money to have been a loan, but he had not repaid any of this money. He then claimed that since his wife owned 50 percent of Claiborne Medical, he did not owe the money back to Claiborne Medical.
Mr. Siddiqui testified that in order for Dr. Afzal to move his practice to 1000 Veterans Blvd., the property had to be renovated. Although he did not have documentary proof, Mr. Siddiqui testified that he received a check for approximately $17,000 for damage to the building and these funds were used for the renovation. Claiborne Medical also paid for renovations to the property.
Mr. Siddiqui explained that he became employed by Claiborne Medical in the middle of 2007. He worked at the “window” in the office as a receptionist. All the documents that were needed to work on the hotel project were also kept at the medical clinic. His salary was $2,000 per month and he worked Mondays through Fridays from 9:00 a.m. to 5:00 p.m. and on Saturdays from 9:00 a.m. to 1:00 p.m. When questioned as to amounts paid to him by Claiborne Medical in excess of his salary, Mr. Siddiqui testified that these amounts sometimes included his wife’s salary. Mr. Siddiqui claimed that Dr. Afzal wrote the checks this way so that Claiborne Medical would not have to pay payroll taxes on these amounts. He also stated that although these checks were deposited into his personal checking account, some of these funds were used to pay expenses of the hotel project. Mr. Siddiqui admitted that Dr. Afzal paid the private school tuition for Mr. Siddiqui’s son in August of 2009 because Mr. Siddi-qui was in a “financial crisis” at that time.
| U|Mr. Siddiqui testified that Claiborne Medical purchased several lots adjacent to the clinic building. He assisted Dr. Afzal and Claiborne Medical in negotiating the purchase price and obtaining loans to purchase these properties.
Mr. Siddiqui identified several documents which showed that Siddiqui and Af-zal, LLC was formed in March 2007 showing 50 percent ownership interest in the Siddiquis and 50 percent ownership interest in Dr. Afzal and his wife. Siddiqui and Afzal, LLC purchased additional adjacent lots for the hotel project. All of this property was re-subdivided into one lot and all of the property previously purchased by Claiborne Medical was transferred to Sid-diqui and Afzal, LLC. The property was once again re-subdivided to exclude lot 15A (formerly lots 15 and 16), which is the property where the medical clinic is located. All of the property owned by Siddiqui and Afzal, LLC was then transferred to *467 Days Inn of Kenner, LLC. The operating agreement for Days Inn of Kenner, LLC shows that the Siddiquis owned 60 percent of that entity and that Dr. Afzal and his wife owned 40 percent of that entity. Mr. Siddiqui explained that the 60/40 percent split was done because the majority owner of the entity had to be a United States citizen in order to obtain loans for the hotel project. He claimed that Dr. Afzal agreed to this split even though a 51/49 percent split would have accomplished the majority citizen interest for the purpose of obtaining loans.
Mr. Siddiqui admitted that all of the mortgages on these properties were in the name of Claiborne Medical and there was a verbal agreement for Dr. Afzal to pay the mortgages. He told Dr. Afzal that once the hotel was up and running, he would pay the notes on the mortgages. Mr. Siddiqui also admitted that Claiborne Medical paid all of the expenses for the hotel project, including architectural and engineering fees which amounted to approximately $230,000. Mr. Siddiqui testified that he did not intend to reimburse Claiborne Medical for these expenses. In Rather, Dr. Afzal agreed to pay all of the expenses and they would split the profits of the hotel.
Dr. Afzal testified that he hired Mr. Siddiqui as a receptionist for Claiborne Medical in 2007 at a salary of $2,000 per month. Due to threats made by Mr. and Ms. Siddiqui, he paid Mr. Siddiqui amounts in excess of this salary, which were recorded as miscellaneous salary in his accounting system. Mr. Siddiqui threatened that if he was not given additional money, Ms. Siddiqui would withdraw her sponsorship for Dr. Afzal’s visa and he would be deported within 24 hours. In addition, Dr. Afzal also paid $29,000 in income taxes for the Siddiquis and private school tuition for their son. Dr. Afzal denied that checks made out to Mr. Siddi-qui also included a portion of Ms. Siddi-qui’s salary, or that amounts were paid to Mr. Siddiqui to avoid paying payroll taxes. Rather, checks were made payable to Mr. Siddiqui because Mr. Siddiqui was the one who demanded money. In 2005, in exchange for Ms. Siddiqui signing his immigration documents, he agreed to give the Siddiquis a $50,000 loan. Dr. Afzal had to obtain a loan in order to make this loan to the Siddiquis.
After Hurricane Katrina, Dr. Afzal moved to Lafayette and began practicing medicine there. He was told by Mr. Siddi-qui that he could not work for anyone other than Claiborne Medical or he would be deported. Additionally, Ms. Siddiqui needed a job, so he agreed to move his practice to the building on Veterans Blvd. Mr. Siddiqui coordinated the renovations on the property. The property was owned by SGI, who was having difficulty making the mortgage payments on the property. Dr. Afzal purchased the property from SGI in June of 2006.
After Mr. Siddiqui brought to his attention that he was eligible for disaster loans, Dr. Afzal filled out and presented the required paperwork to the Small Business Administration and the New Orleans Regional Business Development |12Loan Corporation. Dr. Afzal obtained $230,000 in loans from the New Orleans Regional Business Development Loan Corporation.
Dr. Afzal filed an affidavit with the Louisiana Secretary of State attesting that Claiborne Medical had a change of officers in that Ms. Siddiqui was now a partner with a 50 percent ownership interest in Claiborne Medical. Dr. Afzal testified that he was not aware that a non-physician was not able to have an ownership interest in a medical corporation. Dr. Afzal testified that Mr. Siddiqui told him that the transfer of ownership was done solely to obtain *468 the loans, and that the Siddiquis would not ask for 50 percent ownership of Claiborne Medical.
Dr. Afzal stated that the Siddiquis started reminding him that his immigration status was in their control in 2000. In 2005, after the Siddiquis’ Thrifty franchise was sold, the Siddiquis began making threats to him regarding his immigration status. Claiborne Medical purchased additional adjacent property on December 26, 2006. In order to purchase this property, Mr. Siddiqui set up a loan for Claiborne Medical from Gulf Coast Bank. This money was needed for the hotel project. Dr. Afzal testified that he purchased this property because he was constantly being reminded of his immigration status by the Siddiquis. In 2008 and 2009, the Siddiquis made reports to immigration officials which caused a delay in Dr. Afzal obtaining his “green card.”
Dr. Afzal was aware that Siddiqui and Afzal, LLC was a 50/50 percent ownership split and was formed for the development of a hotel. He stated that he was forced to sign the document transferring all property from Claiborne Medical to Siddiqui and Afzal, LLC because of threats to his immigration status. When Dr. Afzal received $67,000 from insurance due to his New Orleans office having been destroyed by Hurricane Katrina, he gave $35,000 to the Siddiquis because “they demanded it.” Because the Siddiquis continued to demand additional money, Dr. |13Afzal borrowed from his life insurance policy, his retirement account, and his credit cards. By 2009, he could no longer continue giving the Siddiquis money because he was maxed out on loans and had no more resources.
When Days Inn of Kenner, LLC was formed, Dr. Afzal thought the ownership interest was still 50/50. When the property was transferred from Siddiqui and Af-zal, LLC to Days Inn of Kenner, LLC, he thought the split was still 50/50. Dr. Afzal testified that when he signed the operating agreement for Days Inn of Kenner, LLC, the split was 50/50 and the document was later altered to reflect the 60/40 split. When all of the documents creating the LLCs and transferring the various properties were signed, Dr. Afzal was not represented by independent counsel. He admitted that he did not attempt to obtain independent legal counsel, and although he had an attorney who had helped him with his immigration process, he did not seek assistance from an immigration attorney when the Siddiquis threatened him regarding his immigration status. Dr. Afzal stated that he did not hire an attorney because he was threatened that if he hired an attorney, there would be more consequences for him regarding his immigration status.
Dr. Afzal paid all of the expenses for the hotel project which amounted to approximately $280,000. The Siddiquis told him that they would repay him once the hotel was up and running. He denied that he paid the expenses for the hotel in exchange for an interest in the hotel.
In 2010, the Siddiquis made complaints to the Louisiana Attorney General and the Internal Revenue Service regarding Dr. Afzal. As a result of these complaints, at the time of trial, Dr. Afzal had Medicare fraud charges pending against him. This drastically reduced his income since the majority of his patients were on Medicare.
|14At the conclusion of the trial, the trial judge allowed the parties to submit post-trial memoranda. The judge then rendered judgment in favor of plaintiffs against defendants for $50,000 plus interest, declaring that Dr. Afzal is the sole owner of Claiborne Medical, and denying all claims in defendants’ reconventional *469 demand.[2] Although plaintiffs appealed this judgment, the appeal was dismissed and the matter was remanded because the judgment appealed from was not a valid, final judgment. Claiborne Med. Corp. v. Siddiqui, 12-759 (La.App. 5 Cir. 2/28/13), 113 So.3d 1109. On remand, a supplemental judgment was issued which provides: (1) an award in favor of plaintiffs for $50,000 plus interest against Mr. Sid-diqui; (2) finding Claiborne Medical is the sole owner of Lot 15-A and “denying all other requests for judicial recognition of ownership”; (3) denying and dismissing plaintiffs’ requests for reimbursement of nonwage amounts paid to defendants; (4) denying and dismissing plaintiffs’ requests to “dissolve certain transfers of immovable property from Claiborne Medical to Afzal and Siddiqui, LLC and Days Inn of Ken-ner, LLC”; (5) denying and dismissing all requests for damages “relating to payments made by Claiborne Medical Center in connection with investment loans”; (6) denying and dismissing “Claiborne Medical’s request for reimbursement of $230,000 allegedly paid for architectural services”; and (7) denying and dismissing Dr. Afzal’s request for damages for emotional distress. This appeal by plaintiffs followed.

ASSIGNMENTS OF ERROR

On appeal, plaintiffs/appellants assign the following errors, to-wit:
1. The trial court committed manifest error when determining that appellants were not entitled to any relief as provided by La. C.C. article 2033.
11fi2. The trial court committed manifest error when denying appellants’ request for reimbursement of non-wage amounts paid to appellees.
3. The trial court committed manifest error when denying appellants’ request for damages related to payments/loans made by Claiborne Medical Corporation and Judgment rendered against it in connection with investment loans.
4. The trial court committed manifest error when denying Claiborne Medical Corporation’s request for reimbursement of $230,000 paid for architectural and other professional services.

LAW AND ANALYSIS

Because plaintiffs submitted one combined argument on their specific assignments of error, these assignments will be addressed together. In these assignments of error, plaintiffs contend that since the transfer of ownership of Claiborne Medical to Ms. Siddiqui was an absolute nullity, the trial court erred in determining that Claiborne Medical was not entitled “to be restored to the situation that existed before the contract was made” or for damages. In support of this position, plaintiffs cite to the trial court’s reasons for judgment stating that “Dr. Afzal should have known of the defect making the contract [to transfer 50 percent of Claiborne Medical] null.” Plaintiffs also point out that both Dr. Afzal and the Siddiquis testified that they were unaware that a non-physician may not own any interest in a medical corporation. Plaintiffs contend that the trial court’s failure to recognize these admissions is manifest error. Plaintiffs admit, however, that the articles of incorporation for Claiborne Medical state that only a person licensed to practice medicine shall be entitled to participate in the corporation’s earnings, but contend that this was not sufficient for Dr. Afzal to be aware that transfer of an interest in the corporation to a non-physi *470 cian is an absolute nullity. Plaintiffs then point to numerous exhibits in support of their proposition that these transfer documents, which were prepared by an attorney at the request of the Siddiquis, are difficult to understand. Specifically, plaintiffs point to one document which | ^transfers property from the Siddiquis to Claiborne Medical “as contribution of capital to the company and in return for Siddi-qui’s receipt of additional membership interest of the Company,” noting that this document was signed only by the Siddiquis and not by Dr. Afzal. They then point to another document prepared by an attorney retained by the Siddiquis which transfers property to Siddiqui and Afzal, LLC as capital contribution which was accepted as a distribution from Claiborne Medical property. They also point to additional documents to conclude that these documents endorse the proposition that a non-physician may own an interest in a professional medical corporation, and thus these documents represent an “intricate tangle of prohibited acts.” Plaintiffs contend that since these documents were prepared by an attorney, Dr. Afzal was allowed a “certain confidence” that these documents were legally enforceable.
Plaintiffs go on to argue that because the trial court erred in stating that the transfer of a 50 percent ownership interest in Claiborne Medical to Ms. Siddiqui was a “sham”, this presumes that the Siddiquis did not believe that any transfer was valid, because the Siddiquis have continued to claim ownership of Claiborne Medical throughout these proceedings. Plaintiffs contend that the trial court’s finding that Dr. Afzal admits that no “strings” were attached to Ms. Siddiquis’ agreement to sponsor his H1B application in 2000 and 2005, and then finding that there was no connection between the transfer and Dr. Afzal’s H1B status, is contradictory.
Plaintiffs further argue that they are entitled to recover damages from defendants because such recovery would “further the interest of justice.” In support of this position, plaintiffs cite to the alleged disparity in business and education between Mr. Siddiqui (an attorney) and Dr. Afzal, the fact that the documents were prepared by an attorney on behalf of the Siddiquis and Dr. Afzal’s |17lack of legal representation, and that the net effect of the transactions was to allocate a 60 percent ownership in an LLC to the Siddiquis with the Siddiquis incurring no liability.
Finally, plaintiffs contend the trial court erred in determining that Louisiana Civil Code article 2033 (quoted infra) cannot apply because Dr. Afzal failed to establish that revenues of the clinic were wrongly diverted to the Siddiquis and that there was no evidence of revenue sharing. Plaintiffs contend that documents were introduced showing that Claiborne Medical paid for architectural, engineering and consultation services for Days Inn of Ken-ner, LLC, Claiborne Medical paid for real estate which was transferred to Days Inn of Kenner, LLC, and payments were made to the Siddiquis over and above their respective salaries. Plaintiffs contend that the Siddiquis used their claim to the net profits of Claiborne Medical as constituting their contribution to the investment venture of Days Inn of Kenner, LLC.
Defendants respond that plaintiffs simply did not prove their case. They contend that Dr. Afzal willingly entered into certain contracts and incurred certain debts in order to build a hotel. They point out that Dr. Afzal had complete and total control of the checking account and accounting books of Claiborne Medical. They conclude that plaintiffs are not entitled to any restoration payments under Article 2033.
*471 Louisiana Civil Code article 2033 provides:
An absolutely null contract, or a relatively null contract that has been declared null by the court, is deemed never to have existed. The parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages.
Nevertheless, a performance rendered under a contract that is absolutely null because its object or its cause is illicit or immoral may not be recovered by a party who knew or should have known of the 118defect that makes the contract null. The performance may be recovered, however, when that party invokes the nullity to withdraw from the contract before its purpose is achieved and also in exceptional situations when, in the discretion of the court, that recovery would further the interest of justice. Absolute nullity may be raised as a defense even by a party who, at the time the contract was made, knew or should have known of the defect that makes the contract null.
Plaintiffs reason that because the contract giving Ms. Siddiqui a 50 percent ownership interest in Claiborne Medical is an absolute nullity, then all of the subsequent contracts which plaintiffs entered into are also null. They contend that the end result was that the Siddiquis own 60 percent of Days Inn of Kenner, LLC for which they incurred no liability. For the following reasons, we find this argument to be without merit.
In Louisiana, appellate courts review both law and facts. La. Const, art. 5, § 10(B). The applicable standard of review for a factual finding is the manifestly erroneous or clearly wrong standard. In order for an appellate court to reverse a factfinder’s determination under this standard of review, an appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact, and that the record establishes the finding is clearly wrong. Stobart v. State, Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The ultimate issue to be resolved by the appellate court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. Accordingly, where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Id. at 883. However, where documents or objective evidence so contradict a witness’s story, | t9or if the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, then an appellate court may find manifest error. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). In the absence of such factors, however, and when a factfinder’s determination is based on its decision to credit the testimony of the witnesses, that factfinder’s finding can virtually never be manifestly erroneous or clearly wrong. Id.
Additionally, “[i]n applying the manifestly erroneous — clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.” Id. The credibility determinations of the trier of fact are subject to the strictest deference under the manifest error — clearly wrong standard. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. The rule of falsus in uno *472 falsus in omnibus provides that if one element of a witness’s testimony is proved to be untrue, the entirety of that witness’s testimony may be rejected by the factfinder. Karagiannopoulos v. State Farm Fire & Cas. Co., 94-1048 (La.App. 5 Cir. 11/10/99), 752 So.2d 202, 210, writ denied, 99-2866 (La.12/10/99), 752 So.2d 165, and writ denied, 1999-3474 (La.2/11/00), 754 So.2d 940. This doctrine does not require rejection of the entirety of a witness’s testimony. Id. The weight to be given the remainder of the witness’s testimony is to be determined by the trier of fact, given the circumstances of each case. Id.
This matter was tried over a three-day period. Except for the short testimony of the notary to some of the documents at issue, the only witnesses were Ms. Sid-diqui, Mr. Siddiqui, and Dr. Afzal. Each party testified extensively as to their version of the events that took place between and among themselves. In its reasons for judgment, the trial court found that plaintiffs failed to prove that Dr. Afzal entered into any of the business agreements with the Siddiquis under force or |20duress. The court found that Dr. Afzal’s testimony regarding force and duress was not credible. Significantly, the court noted that Dr. Afzal was free to seek sponsorship for his immigration from someone other than Ms. Siddiqui. Most importantly, the court noted that since Dr. Afzal’s H1B visa was approved on March 15, 2005, the Siddiquis “had no real leverage over Dr. Afzal at any time relevant to this litigation.” The trial court concluded that “Dr. Afzal willingly took certain business risks and is now looking to minimize his losses through this lawsuit.” Upon review, we find that the evidence clearly supports this conclusion by the trial court.
While the Siddiquis adamantly testified that Dr. Afzal gave Ms. Siddiqui a 50 percent ownership interest in Claiborne Medical, Dr. Afzal testified that the Siddi-quis told him that they knew this was for immigration purposes only and they were not going to claim that they actually owned 50 percent of the medical practice. The testimony clearly demonstrated that Dr. Afzal had complete control of Claiborne Medical, including the company’s checkbook and finances.
Dr. Afzal’s testimony that he paid money to the Siddiquis and signed various documents due to threats and intimidation by the Siddiquis was simply not believed by the trial judge. Dr. Afzal testified that he did not seek the advice of an immigration attorney because if he had, the consequences he would have suffered regarding his immigration status at the hands of the Siddiquis would be increased. The trial judge clearly rejected this testimony. As the trial judge found, at the time Dr. Afzal entered into the agreements at issue, his H1B visa had already been approved.
Although Dr. Afzal testified that he was not represented by legal counsel when he signed various documents, he presented no evidence showing that he was prevented from seeking legal counsel. In fact, the articles of incorporation for |21 Claiborne Medical prepared in 2000 show that the agent for service of process was the same attorney who represented Dr. Afzal throughout these proceedings. Further, Dr. Afzal testified that the same law firm that prepared all of the documents setting up the two LLCs and the numerous property transfers represented Dr. Afzal in his claim against his insurer for damage to his New Orleans clinic building after Hurricane Katrina.
Throughout their testimony Dr. Afzal, Ms. Siddiqui, and Mr. Siddiqui all referred to assisting each other because they were family. Indeed, the testimony at trial bears out that Ms. Siddiqui assisted with Dr. Afzal’s immigration because he was *473 married to her younger sister. Mr. Siddi-qui testified that he did not have knowledge that Dr. Afzal had given Ms. Siddiqui a 50 percent ownership interest in Claiborne Medical at the time the transfer was made because “Dr. Afzal was family.” Dr. Afzal testified that he transferred the 50 percent ownership interest in Claiborne Medical to Ms. Siddiqui because due to immigration requirements, he could not be sole owner of the corporation that employed him. He testified that the Siddi-quis told him that they did not actually expect to receive 50 percent ownership of Claiborne Medical.
After Hurricane Katrina, Dr. Afzal’s office was destroyed. He relocated to Lafayette, but then was made aware that the building owned in part by Mr. Siddiqui was available to relocate his medical practice. In addition, Ms. Siddiqui, an employee of the medical clinic, was available to continue working at the clinic. Further, the testimony indicates that after Mr. Sid-diqui sold the Thrifty car rental agency, he suffered financial hardship. The testimony is clear that Dr. Afzal loaned him $50,000. Dr. Afzal hired Mr. Siddiqui to work in his medical clinic. Thus, the testimony indicates that Dr. Afzal was assisting the Siddiquis, who were his wife’s family members, through a financial hardship.
^Further, the testimony indicates that Dr. Afzal and Mr. Siddiqui agreed to develop a hotel on the property adjacent to the clinic building. Mr. Siddiqui had knowledge that disaster loans were available to Claiborne Medical. Mr. Siddiqui and Dr. Afzal obtained these loans through Claiborne Medical in order to purchase property on which to construct a hotel. The testimony indicates that these monies were to be repaid once the hotel was up and running. Thus, the evidence supports the trial court’s conclusion that Dr. Afzal failed to establish that any revenues were wrongly diverted to the Siddiquis. Further, the trial court did not err in denying plaintiffs’ request for damages related to the investment loans. The evidence indicates the Dr. Afzal willingly made loans to finance the construction of a hotel in which he was to be a part owner.
With regard to the ownership of Lot 15-A (the location of the clinic building), the evidence shows that when the multiple parcels of land were re-subdivided into Lot 95-D, Lot 15-A was carved out of the re-subdivision. Mr. Siddiqui explained that this was done so that the clinic could operate separately from the hotel. This was discussed among himself, Dr. Afzal, and “attorneys.” They did not want anyone who may have had some type of claim against the clinic to be able to also go against the hotel and visa versa. Based on Mr. Siddiqui’s testimony and Exhibit 38, Lot 15-A was transferred to Claiborne Medical on May 28, 2008. Thus, the evidence supports the trial court’s ruling that Lot 15-A is owned by Claiborne Medical. Plaintiffs’ argument that the trial court made this award “in kind” because it felt that plaintiffs were entitled to some damages is thus without merit.
Finally, we find no error with regards to the trial court’s denial of plaintiffs’ request of reimbursement of architectural and other professional services for the hotel project. Mr. Siddiqui testified that Claiborne Medical was involved in the | gjhotel project because it was an established business that earned money, making it able to secure loans for the hotel project. He further explained that it was Dr. Af-zal’s idea for Dr. Afzal to pay for all of the expenses and the property for the hotel project and they would split the profits of the hotel. Dr. Afzal used the monies received from the disaster loans to finance the hotel project. Further, Dr. Afzal acknowledged he gave 50 percent ownership *474 of Claiborne Medical to Ms. Siddiqui because this was needed to get the loans— there had to be an owner who was a United States citizen. Additionally, Mr. Siddiqui testified that Days Inn of Kenner, LLC had to have a majority owner who was a United States citizen to obtain additional loans for construction of the building. We reject plaintiffs’ contention that it was illogical that the Siddiquis owned 60 percent of an entity for which they incurred no debt. The testimony indicates that the Siddiquis were to repay plaintiffs once the hotel was up and running. Unfortunately, the project apparently never came to fruition.
Based on our review of the record as a whole, for the reasons set forth herein, we find that a reasonable factual basis does in fact exist for all of the particular findings of the trial court in this case, and that the record establishes that all of the particular findings of the trial court in this case are not clearly wrong. Accordingly, plaintiffs’ assignments of error are without merit.

CONCLUSION

For the foregoing reasons, the judgment of the trial court under review is affirmed.

AFFIRMED.

. The trial court issued a temporary restraining order; a preliminary injunction was sub *463 sequently ordered by consent of the parties. As reflected in the trial court’s May 31, 2012 judgment, plaintiffs’ request for a permanent injunction was denied.

. Defendants have not appealed this ruling.