STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

13-1449


DEMPSEY RAY WILEY

VERSUS

BAYOU GAMING, INC.
AND FRED TAYLOR


**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, DOCKET NO. 43,552-A
HONORABLE KATHY JOHNSON, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, J. David Painter, James T. Genovese, and John E. Conery, Judges.

**REVERSED.**

Thibodeaux, Chief Judge, dissents and assigns written reasons.

**Paul A Lemke III**
**Post Office Box 595**
**Harrisonburg, Louisiana  71340**
**(318) 744-5431**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Fred and Nicole Taylor**

**V. Russell Purvis**
**Smith, Taliaferro & Purvis**
**407 Mound Street**
**Post Office Box 298**
**Jonesville, Louisiana  71343**
**(318) 339-8526**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Dempsey Ray Wiley**

**GENOVESE, Judge.**

In this personal injury action, Defendants, Fred and Nicole Taylor, appeal the trial court's judgment finding them liable and awarding damages for the injuries sustained by Plaintiff, Dempsey Ray Wiley, as a result of a barroom scuffle. For the following reasons, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The record indicates that on October 14, 2007, Dempsey Wiley (Wiley) was present at the Stockyard Saloon, a bar located in Vidalia, Louisiana. According to his petition filed on May 13, 2008, Wiley alleged he "was physically attacked and beaten by Fred Taylor and other employees of the Stockyard Saloon."[1] The petition further described the alleged attack as follows:

> After [Wiley] had been knocked to the ground[,] he was repeatedly stomped and kicked by Defendant, Fred Taylor[,] and the other unknown employees of Defendant Bayou Gaming, Inc.
>
> []
>
> [Wiley] suffered grievous injuries caused by the beating which was caused by the intentional acts of Defendant, Fred Taylor[,] and negligent acts of Defendant, Bayou Gaming, Inc. Further, Bayou Gaming, Inc., is vicariously liable for all acts of Fred Taylor.
>
> []
>
> [Wiley] suffered numerous injuries as a result of the beating necessitating numerous surgeries[,] and on April 4, 2007, [Wiley's] foot was amputated as a result of the beating suffered by [him].

In September 2008, Wiley filed an amended petition naming Fred Taylor's wife, Nicole Taylor, as a defendant in her capacity as "[l]essee of Bayou Gaming, Inc., and Stockyard Saloon."

---

[1]Through discovery, it was learned that the Stockyard Saloon was owned by Nicole Taylor, Fred Taylor's wife. The building which housed the Stockyard Saloon was owned by Bayou Gaming, Inc. (Bayou Gaming). Nicole Taylor leased the building which housed the Stockyard Saloon from Bayou Gaming.

A bench trial was held on February 16 and 17, and November 16, 2012. Following the presentation of Wiley's case, the trial court granted a motion for involuntary dismissal[2] in favor of Bayou Gaming[3] and denied a motion for involuntary dismissal sought by Nicole Taylor.[4] At the conclusion of the trial, the matter was taken under advisement, and the filing of post-trial memoranda was allowed.

On April 1, 2013, the trial court issued written Reasons for Judgment and signed a Judgment in favor of Wiley. In its written Reasons for Judgment, the trial court stated the following relative to the issue of Fred Taylor's liability:

> While the testimony is contradictory with regard to this issue, the uncontested fact is that [Wiley] had sustained significant injuries by the time Concordia Parish Deputies Webber and Merrill arrived at the Stockyard which Dempsey did not have when he arrived. Further it is obvious to this Court that these injuries could not have been sustained by [Wiley] merely as a result of a fall or from his kicking a truck as Fred testified. This Court gives much weight to the testimony of Dr. J.H. Fairbanks, [Wiley's] treating orthopedic surgeon, who testified in his deposition that the injuries received by [Wiley] simply could not have been sustained from a fall or from kicking a truck[,] but the trauma suffered by [Wiley] had to be occasioned by the infliction of an outside force[.]
>
> . . . .
>
> This Court is of the opinion that the "outside force" was the direct result of the excessive use of force by Fred in removing [Wiley] from the premises. Even if [Wiley] was intoxicated, belligerent, and using abusive language, use of excessive physical force by Fred in removing [Wiley] from the premises is not permitted[.]

---

[2]We note that at trial, these requests were incorrectly referred to as motions for directed verdicts; however, the correct designation for this procedural vehicle "[i]n an action tried by the court without a jury" is a motion for involuntary dismissal. La.Code Civ.P. art. 1672(B).

[3]The trial court granted Bayou Gaming's motion for involuntary dismissal, stating that Wiley had "not met [his] burden of showing that [Bayou Gaming was] liable in any way other than they were the lessor to [Nicole] Taylor."

[4]The trial court denied Nicole Taylor's motion for involuntary dismissal, stating "[t]here is sufficient evidence to show that she was the lessor of the establishment and the owner of the bar."

2

The trial court found that Fred Taylor had committed the intentional tort of battery on Wiley and that Nicole Taylor, d/b/a the Stockyard Saloon, was vicariously liable for Fred's tortious actions. The trial court awarded damages to Wiley as follows:

> General damage award for broken ankle, facial contusions, lacerations and damage to his shoulder: $80,000.00
> (To be reduced by 30% due to comparative fault of [Wiley]) $56,000.00
>
> General damage award for loss of leg: $300,000.00
> (To be reduced by 70% due to comparative fault of [Wiley]) $90,000.00
>
> Past lost wages: $75,433.00
> (Calculated from date of injury, Oct. 14, 2007, until date of report of Dr. Rice, February 18, 2009)
> (To be reduced by 30% due to comparative fault of [Wiley]) $52,803.10
>
> Future lost earnings: $567,663.00
> (Based on report of Dr. Rice, dated February 18, 2009)
> (To be reduced by 70% due to comparative fault of [Wiley]) $170,298.90
>
> Special damages for hospital expenses for initial injury: $20,257.41
> (To be reduced by 30% due to comparative fault of [Wiley]) $14,180.18
>
> Special damages for hospital expenses for amputation of leg: $97,272.90
> (To be reduced by 70% due to comparative fault of [Wiley]) $29,181.87
>
> TOTAL AWARD:                                    $412,464.05

Fred and Nicole Taylor have filed a suspensive appeal.

**ASSIGNMENTS OF ERROR**

Fred and Nicole Taylor appeal the trial court's April 1, 2013 Judgment, specifying the following assignments of error:

[1.] The trial court erred in finding that Fred Taylor was liable for an intentional tort of battery on Dempsey Wiley.

[2.] The trial court erred in finding that Nichole [sic] Taylor was vicariously liable for the actions of Fred Taylor and that she was negligent in protecting the patrons in her drinking establishment.

[3.] The trial court abused its discretion in awarding Mr. Wiley a personal injury judgment of $412,464.05 dollars as this award was unsupported by the record and testimony.

## LAW AND DISCUSSION

Whether the trial court erred in finding that Fred Taylor was liable for committing the intentional tort of battery on Wiley is a factual determination by the trial court requiring that we apply the manifest error standard of review. In *Ashley v. Strong*, 09-336, pp. 2-3 (La.App. 3 Cir. 10/07/09), 19 So.3d 1260, 1261-62 (quoting *Poole v. Poole*, 08-1325, pp. 4-5 (La.App. 3 Cir. 4/1/09), 7 So.3d 806, 810), this court set forth the applicable standard of review as follows:

> [A] factual determination of the trial court . . . is subject to the manifest error/clearly wrong standard of review. *Stobart v. State, Through Dep't. of Transp. & Dev.*, 617 So.2d 880 (La.1993).
>
> In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Id*. Where there is conflict in the testimony presented at trial, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A trial court's credibility determinations are subject to the strictest deference, and the manifest error or clearly wrong standard demands great deference for the trial court's findings. *Theriot v. Lasseigne*, 93-2661 (La.7/5/94), 640 So.2d 1305. "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Stobart*, 617 So.2d at 882. Thus, if the trial court's decision is reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though the appellate court would have weighed the evidence differently. *Rosell*, 549 So.2d 840.

4

Fred and Nicole Taylor assert that the trial court erred in finding that Fred Taylor was liable for committing the intentional tort of battery on Wiley. Fred Taylor denies battering Wiley and alleges that Wiley caused his own injuries. Fred and Nicole Taylor contend that the evidence at trial established that Wiley "was very intoxicated, . . . was belligerent and aggressive with other patrons in the bar and the lady working the bar and was asked to leave[,]" and that he "became aggressive and hostile with everyone in the bar[.]" Finally, Fred and Nicole Taylor assert in brief that the trial court erred in relying upon Wiley's testimony to determine that he had proven by a preponderance of the evidence that Fred Taylor had battered him, particularly when Wiley "admitted he had blackouts and his memory was vague about before and during the incident he alleges he was battered." For the reasons that follow, we find the trial court's determination relative to Fred Taylor's liability to be manifestly erroneous and reverse the Judgment of the trial court accordingly.

Whether Fred Taylor battered Wiley was hotly contested. The testimony of Wiley and Fred Taylor was correctly characterized by the trial court as "contradictory[.]" Wiley told one version of the incident, while Fred Taylor told another. After thoroughly reviewing the record, we find that there is no reasonable factual basis for the trial court's finding that it was proven by a preponderance of the evidence that Fred Taylor committed an intentional battery on Wiley. We, therefore, find that the record establishes that the trial court was clearly wrong.

First to testify at trial was Deputy Phillip Webber, an Investigator with the Concordia Parish Sheriff's Department. On October 14, 2007, he was a patrol deputy, and he responded to the complaint call made from the Stockyard Saloon. He recalled speaking to Fred Taylor upon arriving, who stated that he "put [Wiley]

5

out of the bar." Deputy Webber testified that Wiley "seemed to be very intoxicated. He was belligerent, you know, yelling, screaming. And he was telling me that Fred and whoever else there had jumped on him[,] and he was kind of hard to control at that time." According to Deputy Webber, the Sheriff Office's dispatch record indicated that: (1) the complaint call was received from the Stockyard Saloon at 8:42 p.m.; (2) the complaint call was made by Fred Taylor; (3) he arrived on scene at 8:45 p.m.; and, (3) he requested a rescue unit for Wiley at 8:51 p.m. Though he did not know whom, Deputy Webber recalled "somebody had Wiley held, like in a bear hug, sitting down on the concrete to the right of the door." Deputy Webber recalled putting Wiley in handcuffs, and it was while Wiley was sitting on the ground, handcuffed, that he complained of being injured, which prompted Deputy Webber to request a rescue unit. Upon being shown photographs of Wiley's face taken in the hospital, and being questioned as to whether he remembered observing injuries to Wiley's face, Deputy Webber testified "I remember his leg. The face, I don't remember it like that. But, I'm not saying it wasn't."

Fred Taylor was asked if, at any point, he ever touched Wiley, and he replied that he "tried to help Mr. Wiley up when he fell against the pool table. [Wiley] got very angry. Started hollering, I took his kids. And I got away from him." Fred Taylor claimed that Tracy Allen Walden, a customer, "got [Wiley] up. Walked out the door with him." When asked how Wiley injured his face, Fred Taylor claimed that, once outside, "he fell face first in [sic] the concrete." Wiley was crying and "hollering he wanted to die[,]" and "[t]hat's when [he] realized, well, ain't nothing you gonna be able to do with him. I called 911." According to Fred Taylor, "long as I stayed to the backside of Mr. Wiley, he was fine. He wasn't struggling.

6

Mr. [Walden] had him laid [out] on the ground [and was] petting [Wiley's] head. He was crying like a baby about his kids dying." Fred Taylor explained that when Deputy Webber arrived, "[Mr. Walden] was laying there rubbing [Wiley's] head, babying him. [Deputy Webber] pulled up and started talking with Dempsey Wiley or whatever. And he started struggling a little bit. He handcuffed him." Upon further questioning by the trial judge, Fred Taylor explained that Wiley walked towards the exit but fell near a pool table. He tried to help Wiley stand up, but "that's when he started trying to fight me, telling me I took his kids. And then I backed off. Tracy [Walden] got, you know, got him up on his feet and walked him out the door." Fred Taylor described what he saw when he walked outside:

> [Wiley] was leaning with his head on the truck crying and everything[,] and he done kicked the tire on the truck a couple of times[,] and he was cussing and turned around and looked at me and told me it was my fault; I did it; I took his kids. And he went to come toward me. Well, I moved backwards. When I did, he fell, cussing, I did it. I did it. Well, I got away from him[,] and [Mr. Walden] took over and I went in the bar and got the phone and called 911 and asked for somebody to come up there and give me a hand.

Danny Merrill, a retired Lieutenant with the Concordia Parish Sheriff's Department, testified that on October 14, 2007, he was a supervisor on patrol and also responded to the complaint call made from the Stockyard Saloon, arriving shortly after Deputy Webber and before the ambulance. According to Lieutenant Merrill, when he arrived, Wiley was lying on the ground. Lieutenant Merrill asked Wiley what had happened, to which he responded, "[W]hat do you think happened?" Lieutenant Merrill asked, "[W]ho did this to you?" Wiley's answer was, "[W]ho do you think did this to me?" Lieutenant Merrill recalled that Wiley complained about his leg, but he did not recall seeing injuries on his face. When Lieutenant Merrill questioned Fred Taylor, he denied touching Wiley.

Mr. Walden, the only disinterested witness to the incident at issue, testified that he overheard Wiley say something offensive to the female bartender and heard Fred Taylor warn Wiley to calm down, or he would be made to leave. According to Mr. Walden, "A little while later [Wiley] said something towards Fred. I didn't really pick up what he said. But, I took it as if it was said to me, I would take it as a threat. And then Fred told him he had to go." Mr. Walden described what happened next as follows:

> Well, Fred told him to leave. [Wiley] got up; started walking towards the door. The pool table closest to the door, when he got there, he just -- like he fell or tripped, like he fell.

> . . . .

> And Fred went over to help him. And then things kind of went downhill after that.

> . . . .

> Well, when Fred went over, you know, to help him up -- because like I said, he fell – [Wiley] got really -- real quickly, got -- well mad. Like he got mad at Fred. He went off on Fred. He started trying to -- Fred bent over to help him up. He kind of reached for Fred like he was fixing to -- like he choked him. It looked like he was choking him.

Mr. Walden testified that he helped Wiley out of the door because Fred Taylor's efforts to help Wiley stand up to leave only made matters worse. Mr. Walden explained that once outside, Wiley kicked a vehicle's bumper, and "he fell down on the ground. He tried to get up. He fell down again and hit is [sic] face on -- well not hit. Kind of like, like fell down trying to get back up." According to Mr. Walden, Wiley "started acting like his leg was hurting." He admitted that he held Wiley down until a sheriff's deputy arrived, stating "I was sitting on the ground and [Wiley]'s head and torso was [sic] in my lap. I was trying to restrain him from getting up. Because, he said he was hurt." He asked for someone to get

8

a washrag because Wiley was bleeding from falling and hitting his head on the ground, and because he thought a cool rag would calm him. Mr. Walden denied battering Wiley and disputed the allegation that Wiley was battered by anyone at the Stockyard Saloon. Mr. Walden's testimony was clear that Wiley's injuries were not inflicted by Fred Taylor.

Joyce Marie Tanner went to the Stockyard Saloon with Wiley, her brother. According to Ms. Tanner, Wiley was not hurt and did not have any trouble walking when they arrived at the bar. She stayed for about an hour, but left before the incident at issue occurred. When she returned, Wiley was being loaded into an ambulance.

Under direct examination, Wiley described what occurred to him as:

> Fred come jerked me off the bar stool. And when he went on the floor, I was on top. Somebody kicked me off. That's when the stomping starts. And then the next thing I remember, I'm by the pool table being stomped. And then when we get outside he's knocking me over this iron pipe that goes down the front of the bar. And then the next thing I remember, they loading me up in the ambulance.

When asked specifically by the trial judge, "What did you say happened about the iron bar outside?" Wiley replied, "The problem is, see, I just remember bits and pieces of it. But, what I do remember is Fred knocking me over that pole -- that pole outside." When asked what happened next, Wiley answered, "Well, I don't remember. All I know the next thing it was the ambulance and the cops were there."

Under cross-examination, Wiley was asked if he said anything to Fred Taylor while he was in the bar, and he replied, "It's possible I could have. . . . I don't remember. But, I'm sure he come jerked me off of there for some reason." Wiley testified that he drank three beers with his coworkers before leaving work

9

around four o'clock and, while at the Stockyard Saloon, he remembered drinking beers and a shot of Jagermeister. When asked by the court how many beers he drank at the Stockyard Saloon, Wiley admitted that he did not know. He said, "It was two or three -- three or four." Wiley admitted that he did "not even remember getting out the door[,]" but he was certain that he "never kicked a truck." When asked whether it was his testimony that two people attacked him, he replied, "I am not sure. But, I know that Fred -- when Fred was kicking me, me trying to cover up from him, somebody was kicking me in the head. So, I guess that adds up to be two." When the trial judge inquired, "And you testified that -- sometimes you blacked out. You don't remember some of the facts that night." Wiley acknowledged, "Yes, ma'am."

Lindsey Nicole Meyers was the bartender at the Stockyard Saloon the night the incident at issue occurred. Ms. Meyers testified that Wiley became upset because Fred Taylor "wouldn't let him charge, have a charge account." She witnessed Fred Taylor ask Wiley to leave "two or three times" before he escorted him out the door. Ms. Meyers did not go outside. She testified that she did not see anyone stomp, push, or hit Wiley. In her opinion, Wiley was drunk and "upset because his son just got killed."

Dr. J.H. Fairbanks, an orthopedic surgeon, treated Wiley in the hospital for his injured right leg. Dr. Fairbanks did not testify at trial; instead, he testified via deposition. Photographs taken of Wiley in the hospital were attached to his deposition. Noteworthy is the fact that Dr. Fairbanks did not recall the injuries to Wiley's face until he was shown photographs, as revealed in the following exchange:

10

PLAINTIFF'S COUNSEL:

Was [sic] there any other injuries that you noticed at the time or diagnosed at the time of the fracture to [Wiley's] ankle?

DR. FAIRBANKS:

Not that I recall.

PLAINTIFF'S COUNSEL:

I've got some photographs I want to show you and I want you to see if that refreshes your memory. These are pictures taken of Mr. Wiley at the time of this.

. . . .

Would these pictures be reflective of the condition of Mr. Wiley at the time you examined him in the emergency room?

DR. FAIRBANKS:

I don't recall that but I would assume they would.

Despite the fact that Dr. Fairbanks did not witness how Wiley was injured and had to "assume" the depiction in the photographs, the trial court clearly and erroneously relied heavily upon his opinion to conclude that Wiley had suffered his injuries as a result of a battery. The exact statements by Dr. Fairbanks upon which the trial court relied and specifically quoted in its Reasons for Judgment are evinced in the following exchange:

PLAINTIFF'S COUNSEL:

There's been some allegations that Mr. Wiley tripped and injured himself, would the injuries that you see in these photographs, would that be indicative of somebody that had tripped and fall [sic]?

DR. FAIRBANKS:

Not likely.

11

PLAINTIFF'S COUNSEL:

Would these be more indicative of somebody that had been beaten?

DR. FAIRBANKS:

Somebody that's been in a fight.

Dr. Fairbanks did not opine that Wiley's injuries were the result of Fred Taylor's actions or those of anyone else. He simply stated that Wiley's injuries were indicative of somebody who had been in a fight. There was no proof of a fight much less any injuries incurred by Wiley and inflicted by Fred Taylor as a result of a fight.

After reviewing the record in its entirety, we find that a reasonable factual basis does not exist for the trial court's findings and that the trial court's determination of Fred Taylor's liability is manifest error. The trial court ignored and disregarded the testimony of the only independent witness, Mr. Walden. Not only was Mr. Walden disinterested in the cause, he witnessed the entire event and fully corroborated Fred Taylor's testimony that he did not batter Wiley. The trial court, which acknowledged that "the testimony is contradictory[,]" based its finding that Fred Taylor committed battery due, in part, to the fact that Wiley "had sustained significant injuries by the time Concordia Parish Deputies Webber and Merrill arrived at the Stockyard which [Wiley] did not have when he arrived." This circumstance, combined with the judgment of Dr. Fairbanks that Wiley had "been in a fight" led to the trial court's "opinion that the 'outside force' was the direct result of the excessive use of force by Fred [Taylor] in removing [Wiley] from the premises." However, there was no proof by a preponderance of the

evidence of such an occurrence; thus, there is a failure by Wiley to establish causation between his injuries and Fred Taylor's actions.

In light of the guidance outlined above as applied to the facts of this case set forth in the record, we find manifest error in the trial court's finding that it was proven by a preponderance of the evidence that Fred Taylor committed an intentional battery on Wiley. Considering the evidence in the record, we conclude that the evidence did not establish by a preponderance of the evidence that Wiley was intentionally injured by anyone, much less that Fred Taylor was legally responsible for Wiley's injuries. The trial court was manifestly erroneous and clearly wrong in ruling otherwise. Accordingly, we reverse the judgment of the trial court. Having reversed the trial court on the issue of liability, we need not address the remaining issues of vicarious liability and damages.

## DECREE

For the reasons stated herein, the judgment of the trial court is reversed. Costs of this appeal are assessed against Plaintiff/Appellee, Dempsey Ray Wiley.

**REVERSED.**

DEMPSEY RAY WILEY

VERSUS

BAYOU GAMING, INC. AND FRED TAYLOR


**THIBODEAUX, Chief Judge, dissenting.**

The proper standard of review is manifest error which the majority acknowledges. The majority further observes that the issue of an intentional battery was "hotly contested." The plaintiff testified that he was beaten violently and stomped on. One of the defendants indicated the plaintiff was intoxicated and suffered an unprovoked fall. The trial judge heard and weighed this testimony. After doing so, she concluded that "[t]he testimony of the witnesses varied substantially as to what actually transpired and often is directly contradictory." She then went on to summarize the testimony and concluded that "it is obvious to this Court that these injuries could not have been sustained by Dempsey merely as a result of a fall or from kicking a truck as Fred testified. This Court gives much weight to a testimony of Dr. J. H. Fairbanks, Dempsey's treating orthopedic surgeon . . . ." Dr. Fairbanks clearly indicated that the plaintiff's injuries would not be indicative of "somebody that had tripped and [fallen]." Rather, they would be indicative of "somebody that's been in a fight." Clearly, the trial court believed the testimony of Dr. Fairbanks and did not believe the testimony of the witnesses who said that the plaintiff happened to have kicked a truck in the parking lot and suffered an unprovoked fall. Dr. Fairbanks's testimony was particularly persuasive given the fact that the plaintiff's injury required a plate and some screws and an incision about five inches in length. He suffered a bimalleolar ankle fracture.

I would affirm the judgment of the trial court but would reverse on the damages awarded for the leg amputation. Dr. Fairbanks clearly testified in his deposition that the plaintiff failed or refused to follow post-operative care.